**Frank L. SHANNON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 7102.**

District of Columbia Court of Appeals.

Argued Aug. 14. 1973.

Decided Nov. 12, 1973.

Kenneth B. Skelly, Washington, D.C., appointed by this court, with whom Edward J. Gorman, Jr., Washington, D.C., also appointed by this court, was on the brief, for appellant.

Julius A. Johnson, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Hamilton P. Fox, Asst. U. S. Attys., were on the brief, for appellee.

Before GALLAGHER, PAIR · and YEAGLEY, Associate Judges.

PER CURIAM:

Charged by information with soliciting for lewd and immoral purposes,[1] appellant was, after trial without a jury,[2] found

---

1. D.C.Code 1967, § 22-2701.

2. Appellant had no right to a jury trial in this case. See D.C.Code 1972 Supp., § 16-705. See also Marshall v. United States, D.C.App., 302 A.2d 746 (1973).

guilty and sentenced to ninety days imprisonment—the maximum term provided by law. On this appeal he contends that (1) the statute is unconstitutionally vague, (2) the trial court erred in failing to grant his motion for a judgment of acquittal on the grounds of entrapment and the government's failure to establish the elements of the offense, and (3) he was denied a fair and impartial trial. The latter contention is one neither to be made lightly nor to be treated lightly when made for, as we recently indicated,[3] the right to a fair and impartial trial is basic in our system of justice.

For purposes of this appeal we will accept the government's counter statement of the case.

On November 7, 1972, Officer Keeton of the Vice Squad, Metropolitan Police Department, was driving his private car south in the 1000 block of 14th Street, N.W., when he was waived to the curb by two persons standing with others at a corner. Both persons, attired as women, approached the passenger side of the car and one of them (appellant) asked the officer who was in civilian clothes, "You want to go out for a while?" The other person, identified as one Walter Modin, asked, "How much money you spending?" When Officer Keeton replied that he had "about $75", appellant's companion asked where he was staying to which Officer Keeton replied "[T]he Hilton." Mr. Modin said, "We can't get in there, so we'll have to find another place." He left the car to speak to other persons attired also as women who were gathered on the corner. Appellant, while standing at the side of the car, was asked by Officer Keeton what he was going to get for his money, to which appellant replied, "I'll do anything at all." According to Officer Keeton's testimony the following then transpired:

At that time I asked if he would [submit to rectal sodomy], and he [appellant]

said, "I'll do anything at all." So, I asked him what he was best at, and . . . in the meantime, while this conversation was going on, Mr. Modin approached the auto again, and Mr. Shannon then said he would [participate in natural and perverted sexual acts] . . . . "I'm good at everything, baby."

Both appellant and Mr. Modin then got into the car and Officer Keeton drove for a short distance to the 1000 block of Vermont Avenue, N.W., where he placed both men under arrest with the assistance of his partner, Officer Martin, who had followed Keeton's vehicle after observing the two approach it, engaged in apparent conversation, and then enter the vehicle.

After completion of the government's examination of Officer Keeton the court questioned extensively the officer—evidently to further reconstruct the "solicitation". Thereafter on cross-examination the following transpired:

THE COURT: Mr. [Prosecutor], when are you going to start objecting?

PROSECUTOR: I assume he's trying to show entrapment.

THE COURT: About five questions back you should have been on your feet shouting. If this is your first trial, let me know, and I'll try to be a little more kindly to you.

PROSECUTOR: I object, Your Honor.

THE COURT: You better get on your feet; I'm not going to conduct your trial for you.

Now, that series of questions is objectionable at this point. I have ruled on the motion, insofar as this case is concerned, Mr. [Defense Counsel], and you shouldn't go into other procedures. I

---

3. *Cf.* Harvin v. United States, D.C.App., 297 A.2d 774, 777–778 (1972); and *see also* Silverman v. Silverman, D.C.Mun.App., 162 A.2d 773 (1960).

suggest you start doing your job, sir. If not, I'll call for another district attorney.

PROSECUTOR: I object, Your Honor.

THE COURT: You better start paying attention. If you feel you can raise an objection, raise one; if you're in error, I'll overrule you.

PROSECUTOR: Your Honor, I did not feel an objection was appropriate.

THE COURT: Whether it is or not, you sit there and listen to it. If I feel you're not doing your job, then I have to interrupt you. But, I do suggest, sir, that you try to do your own interrupting.

All right; I'll sustain the objection. . . .

. . . . . .

Let's go to it; let's not waste words.

[By Defense Counsel]

Q. Officer, was it not your purpose, in your undercover capacity, to have persons that you were suspicious of approach you and attempt to solicit you?

A. Not specially.

THE COURT: Just a minute. I sustain the Government's objection. He was about to stand up; he may open his mouth sooner or later.

Defense counsel then sought to impeach the officer, with the following result:

THE COURT: Now, wait a minute. If you're going to impeach him, Mr. [Defense Council], I suggest you do it properly or not at all. Do you have anything to impeach him there?

DEFENSE COUNSEL: Yes, Your Honor.

THE COURT: All right; let's lay the proper foundation.

[By Defense Counsel]

Q. Is this your signature, officer?

THE COURT: All right; that's number one, Mr. [Defense Counsel]. What's the next step to impeach him properly?

Q. Did you testify here today that Mr. Shannon asked you, "Do you want to go out for a while, baby?", and then asked you how much money you had?

A. Yes.

Q. Did you at some previous time make a written statement that it was someone other than Mr. Shannon . . .

THE COURT: No, no. Did you at one time make a statement, in writing or otherwise, that is contrary to your statement in Court today? If you know.

THE WITNESS: Ah . . .

THE COURT: To your knowledge, did you testify or write something different from what you've told us today?

THE WITNESS: No, Your Honor.

THE COURT: To your knowledge, no? All right, Mr. [Defense Counsel], show him the piece of paper and let him read it. That's the proper procedure to impeach; the most violated rule of law I've ever seen. Direct him to what you want him to see specifically.

[By Defense Counsel]

Q. Directing your attention to this sentence, starting here. "Shannon, hereafter referred to as D1, and Modin, referred to as D2 . . .". Would you read that to the Court?

THE COURT: Let him read it to himself; you know what is is.

[There was a pause.]

When you finish it, officer, just let us know.

THE WITNESS: OK.

THE COURT: You finish reading it?

THE WITNESS: Yes, sir.

THE COURT: Now, does that refresh your memory?

THE WITNESS: Yes, sir.

THE COURT: Now, repeat the original question, Mr. [Defense Counsel]; I assume there's something there that's contradictory. You've testified you've never written anything different from what you've testified to here today; what is written there?

THE WITNESS: "D–1", referring to Mr. Shannon, "said 'you want to go out for a while, baby?' 'How much money do you have?' I replied, 'I have $75.00' and he then said, 'where are you staying?' I relpied 'I'm staying at the Hilton.' "

THE COURT: Mr. [Defense Counsel], where does that impeach him? Where is the impeachment, Mr. [Defense Counsel]?

DEFENSE COUNSEL: The 163, Your Honor, states, "D1 then asked 'do you want to go out for a while, baby?' ", D1 referring to Mr. Shannon. "D2", referring to Mr. Modin, "asked, 'How much money do you have, honey?' " and the response, "I have about $75.00".

So, Your Honor, according to this, it was Mr. Modin who made the inquiry regarding money.

THE COURT: All right; why don't you show him the 163 and ask him which is right—what he testified to today or what he wrote there.

Do you understand what's going on, officer?

THE WITNESS: Yes, Your Honor. I testified in error.

THE COURT: You testified before that he asked you about the money, is that right?

THE WITNESS: Yes, sir.

THE COURT: And you wrote down that it was Modin who asked about the money?

THE WITNESS: Yes.

THE COURT: Now, which is correct? Was it this one, or was it Modin? That is, that asked about how much money you had?

THE WITNESS: It was Modin.

THE COURT: Mr. [Defense Counsel], that's proper impeachment material; you've just got to learn how to use it properly. That's one of my pet peeves, and you have to suffer through it.

[By Defense Counsel]

Q. Isn't it true, officer, that you were the one who asked Mr. Shannon, "What do I get for my money?"

A. Yes, that's correct.

Q. And his response was "Anything at all"?

A. Yes.

Q. And it was you who suggested that "he would take it up the [rectum]," is that right?

A. Yes.

Q. And his response was anything at all?

A. Yes.

DEFENSE COUNSEL: I have nothing further, Your Honor.

Officer Keeton's testimony respecting the meeting between appellant and himself was corroborated by Officer Martin, with the exception that he was unable to say that appellant had flagged Officer Keeton's car to the curb. Rather, Officer Martin's testimony was that Officer Keeton's car had been parked for some three to five minutes before it was approached by appellant and his companion.

At the close of the government's case, appellant moved for a judgment of acquittal. The court, however, although ruling that Officer Keeton had been impeached, refused to disregard his testimony and de-

nied the motion. The motion for a judgment of acquittal was renewed at the close of appellant's case and was denied—the court saying:

> Mr. [Defense Counsel], I don't have any problems with the testimony. As far as I'm concerned, he lied on the stand. I don't accept his testimony. I accept the police officer's testimony.

> I find him guilty. The question is: What do I do with him now?

Thereafter appellant moved for a judgment n.o.v. or a new trial, and the following transpired:

> THE COURT: What's your other motion? Is that the only one you have?

> DEFENSE COUNSEL: Yes, Your Honor; its combined. The third grounds [were], Your Honor, that . . .

> THE COURT: I'll deny them, even though I haven't seen them.

> . . . . . .

> All right, let's proceed to the sentencing.

Brought into focus by the A.B.A., Project on Standards for Criminal Justice and the Code of Judicial Conduct (Final Draft May 1972) are first principles relating to the "Function of the Trial Judge."

By these standards, trial judges are reminded that a trial is intended to be a dignified and impartial search for the truth. After review of the record in this case we deem it appropriate to say what a courtroom and a trial are not. A courtroom is not a classroom and a trial is not a forum for pedantic displays; nor is it simply an opportunity for the trial judge to participate as an advocate or to deride government or defense counsel. As Judge Learned Hand once said, "Prosecution and judgment are quite separate functions in the administration of justice; they must not merge." United States v. Marzano, 149 F.2d 923 (2d Cir. 1945); cf. Whitaker v. McLean, 73 App.D.C. 259, 118 F.2d 596 (1941).

We need not decide, however, whether appellant in the case at bar was denied a fair and impartial trial, for we are of the opinion that the court erred in denying the motion for judgment of acquittal at the close of the government's case.

■ The testimony of Officer Keeton was that appellant asked the officer if he wanted to go out for a while. Such a question is not a solicitation. Williams v. United States, 71 App.D.C. 377, 110 F.2d 554 (1940). The only other testimony relating to the alleged solicitation was Officer Keeton's inquiry of appellant as to whether he would submit to rectal sodomy and appellant's response. This was obviously not a solicitation by appellant.[4] The motion for judgment of acquittal should have been granted.

Reversed.

---

4. Officer Keeton testified that appellant's companion, Modin, asked him how much money he had. This evidence would, of course, have been admissible against Modin, but was certainly inadmissible as to appellant.

Cf. Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966). We presume the learned trial judge disregarded this testimony, as he was required to do.