605 A.2d 960

**William Reed ALLEN, Jr.**

v.

**STATE of Maryland.**

**No. 1100, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

May 5, 1992.

706

Charles G. Bernstein (C. Robert Loskot and Bernstein, Sakellaris & Ward, on the brief), Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Argued before ALPERT, CATHELL and DAVIS, JJ.

ALPERT, Judge.

This appeal involves a murder-for-hire scheme that resulted in one conviction but, fortunately, no deaths. We shall affirm.

## Procedure below

The grand jury for Allegheny County indicted Dr. William Reed Allen, Jr., appellant, on two counts of common law solicitation to commit murder. Count one charged Allen, a dentist, with soliciting an undercover police officer to kill a Deputy State's Attorney; count two charged Allen with soliciting the undercover police officer to kill a City of Cumberland Police Officer. Judge Gary G. Leasure of the

Circuit Court for Allegheny County, acting in response to appellant's motion for removal, ordered that Allen's case be removed to the Circuit Court for Baltimore County. In a written opinion, Judge Leasure concluded that the totality of the circumstances indicated that the impartiality of jurors in his jurisdiction would be affected by pre-trial matters.[1]

Thereafter, on March 12 through 15, 1991, Judge Joseph F. Murphy, Jr. of the Circuit Court for Baltimore County presided over appellant's jury trial. After deliberating, the jury found Allen guilty on count one and not guilty on count two. Allen moved for a new trial; Judge Murphy denied the motion and sentenced him to twenty-five years' imprisonment, ten years suspended in favor of five years' probation. In this appeal, Allen asks us to answer a number of questions.

1. Did the trial court err in denying the Defendant's Motion for Judgment of Acquittal?

A. Does conviction and punishment for Solicitation violate Article 5 of the Maryland Declaration of Rights?

B. Does the use of Solicitation as a Common Law crime violate the 8th and 14th Amendments to the United States Constitution and Articles 8 and 17 of the Maryland Declaration of Rights?

C. If Solicitation exists in Maryland, does it exist as anything other than a species of attempt?

D. Was the evidence sufficient to show that the defendant was the solicitor or was he merely a solicitee who acquiesced to the state agent's solicitations?

---

1. According to the written opinion,
   [t]he Defendant's legal difficulties have been the subject of extensive local media coverage for in excess of two years. The nature of the pending charges have understandably developed newspaper, radio and TV accounts of his arrest and the nature of potential evidence. In addition there has apparently been media speculation as to Defendant's involvement in the bombing of a trial judge [John P. Corderman] of this Circuit.

E.   Was the alleged Solicitation too vague and indefinite to support a conviction?

F.   If a Solicitation occurred, did it occur at a time prior to the times charged in the indictment?

G.   Should the indictment have been dismissed for duplicity?

2.   Were the court's instructions erroneous?

A.   Did the Court err in charging the elements of the crime?

B.   Did the Court err in adding "predisposition" in its instructions on solicitation?

C.   Did the Court err in failing to instruct with regard to the state witness' prior criminal record, status as an accomplice, as an informer and as a drug abuser?

D.   Did the Court err in failing to instruct with regard to a law enforcement witness?

Appellant ran afoul of the law, apparently quite by accident.   On the evening of September 9, 1988, Officer Shawn Grove of the City of Cumberland Police Department, along with his partner, Officer David Hartman, responded to a complaint regarding a burglar alarm at 820 Windsor Road (Cumberland, Maryland).   Observing an open rear door at the residence, Grove entered in search of intruders.   Once inside, he saw what he believed to be marijuana.   He notified the Narcotics Task Force (NTF), which responded to the scene.   In addition, Grove applied for (as co-affiant) and received a warrant to search and seize items in 820 Windsor Road.

Barry Levine, Deputy State's Attorney for Allegheny County, accompanied the NTF as it executed the warrant. Appellant, along with a female companion, arrived at 820 Windsor Road as the officers executed the warrant.   Upon learning that Allen resided at the premises, the officers arrested and charged him with drug related offenses.   Prior to the chance encounter that evening, neither Grove nor Levine had occasion to know appellant.

Levine, who, at that time, was primarily responsible for drug prosecutions in Allegheny County, represented the State in the prosecutions against Allen. Levine presented the State's position at a suppression hearing at which Grove served as a witness. Subsequently, Levine was present when appellant pled guilty to the charges against him. The court sentenced Allen to eighteen months' imprisonment, seventeen months suspended (supervised probation for three years, including drug testing), and one month of work release with Friends Aware, Inc. (FAI), a non-profit organization for mentally and physically disabled persons.[2] Levine was on hand when the court handed down appellant's sentence.

Appellant, while working at FAI, met Larry Edwin Westwood. FAI employed Westwood from April to October of 1990. Allen and Westwood worked on projects together and gradually built up a rapport with each other. Eventually, Allen told Westwood how he felt about his drug prosecution. Westwood related the conversation to the jury.

Q: [MR. MONACO FOR THE STATE] Did he [Allen] tell you anything about his arrest and/or conviction on the drug charge?

A: Yes, he did.

Q: What did he tell you?

A: He told me that he thought he had been set up and he wasn't happy with being made an example of by the media and by the judicial system in Allegheny County.

. . . . .

Q: When he would discuss either his arrest, his conviction, or his sentence, would he ever mention any specific individuals, would [he] identify names?

A: Yeah.

Q: What?

A: Shawn Grove, the officer that allegedly set him up.

---

**2.** Appellant forfeited his Mercedes Benz automobile pursuant to a plea agreement.

Q: Did he tell you that?

A: Yes. Barry Levine prosecuted him to make an example out of him, just to set an example.

Westwood, in turn, shared the details of his tainted record with appellant.

Q: Mr. Westwood, we have discussed your military record [3] and your criminal background.[4] Did you ever tell William Allen about those things?

A: Yes, I did.

Q: At what point in this sequence of events did you make him aware of those facts.

A: At the Department of Motor Vehicles when we were discussing his conviction.

Q: Approximately how long was this after you had met him? Did the military and criminal information come out at different times or was it pretty much the same time?

A: Basically it had come out at the same time. We were just exchanging life histories, I guess you would call it.

.     .     .     .     .

Q: What else did you tell him about yourself?

A: That I was rowdy.

.     .     .     .     .

Q: Anything else?

A: You know, just—I don't know how to say it. Just my general nature.

Q: Well, did you use specific words? What exactly did you tell him?

A: About drinking and going into bars and terrorizing bars. You know, things like that. Things of that nature.

---

**3.** Westwood served as a tank gunner in the United States Army.

**4.** By his own admission, Westwood's record, after age 18, included felony and misdemeanor (affecting credibility) convictions for armed robbery, "sale of acid to an undercover police officer," passing bad checks, and marijuana possession. Additionally, he admitted to having abused valium and using cocaine, alcohol, "halcion," and marijuana.

Levine occasionally saw Allen around Cumberland, which Levine described as a small town. Aside from noticing appellant outside of the courtroom, Levine next encountered appellant when Allen came before the court to face a violation of probation charge. Levine had filed an amendment to the violation of probation petition originally filed by appellant's probation officer Laurie Meredith. The court found that Allen had violated his probation.[5] Levine noticed that Westwood attended the hearing. Prior to that hearing, Levine had never seen Westwood.[6]

Westwood testified that appellant's distaste for the criminal justice system transformed into a machination after the court found appellant violated his probation.

Q: Mr. Westwood, did Mr. Allen and you ever discuss doing anything specific or anything specifically about Shawn Grove and Barry Levine?

A: Yes, there was such a conversation.

. . . . .

Q: When did that topic of conversation first occur?

A: It occurred after the conviction [sic] for the probation violation.

. . . . .

THE COURT: So, your recollection is this conversation took place the first time the Defendant reported for service after his conviction [sic] for violation of probation?

THE WITNESS: Right.

. . . . .

Q: What was the content of those conversations? What did you say and what did he say?

A: He said he wanted to kill.

---

5. According to appellant's brief, the court never sentenced him for violating his probation.

6. Levine's signature appears on four dockets in cases against Westwood. For differing reasons, all the cases were nol prossed; Levine never saw Westwood.

Q: Who?

A: Barry Levine and Shawn Grove.

Q: What did you say?

A: At first I was shocked as to why. Then he had continued to pursue the conversation with wanting to know if I could obtain dynamite. I told him that I could obtain dynamite. He said he wanted some dynamite to send a package to Mr. Barry Levine because of his pursuit of Billy Allen as an individual.

You see, he felt that he was being singled out and it was just going to be one legal hassle after another because they had it out for him, they wanted him.

Q: Did he ever discuss Shawn Grove?

A: Yes, he did.

Q: What did he say?

A: He wanted Shawn Grove killed, too.

.    .    .    .    .

Q: Did you and he have a conversation about killing Shawn Grove and Barry Levine just once?

A: Oh, no. This was after his conviction [sic] on the probation violation. This was a continual conversation with us. After his conviction [sic] for the probation violation, that's when we started to communicate more; two or three times a week. He would call me at my house or I would call him at his house. . . .

Q: When was the first time that you remember the word kill or murder, something equivalent being used by either you or him in this period of time?

A: Right after his conviction [sic] for the probation violation.

Q: Who used it first? Who brought it up?

A: He did.

Q: You didn't bring it up?

A: What the hell—why should I bring it up. I don't have nothing against them. I'm not the ones [sic] that had been convicted.

Appellant informed others of his dissatisfaction with Grove and Levine. Allen's one-time girlfriend, Kerry Susan Murray, testified that she could not remember the specifics of any conversations with Allen about Grove or Levine, but she knew that Allen did not care for Grove. Christina W. Duffus, appellant's former dental hygienist, stated that appellant felt his arrest was a "set-up." Pamela Shope, who served as Allen's dental hygienist and office manager, testified that Allen told her, on numerous occasions, that he felt he had been "set-up." The only name Allen mentioned, according to Shope, was Grove's. Erin Michelle Shanahan, who tended bar at Colonial Manor L'Ostaeria, remembered that appellant conveyed to her the idea, using other words which she could not recall, that he had gotten a "raw deal."

Two of Allen's co-workers at FAI testified at his trial. James R. Shaffer, a market representative, told the jury that Allen used the word "hit man" when discussing people (unnamed) he did not like.

Q: What did Mr. Allen say at that time, Mr. Shaffer?

. . . . .

A: He said that there were a lot of people in Cumberland that he didn't like. A comment was made to the effect that you just can't get rid of them, they will always be here. He said maybe what I need is a hit man to get rid of them and he laughed. It was in jest. That's how I took it, as in jest.

. . . . .

Q: Did you have any response to that comment, Mr. Shaffer?
A: Taking it as a joke, I just said, well, Bill, you can probably go anywhere in Baltimore and find a crackhead [drug addict] for $500.00 for that, and I just laughed about it.
Q: At that point you thought he was joking?
A: Yes.

Peter Ziler, instructor and job coach with FAI Industries, reinforced Shaffer's testimony.

Q: And do you recall what, if anything, the Defendant stated during that conversation?

A: Well, the statement wasn't made directly to me, it was made to Mr. Shaffer. I only caught parts of it. What I heard was the statement do you know where I could get a hit man. When I looked, Mr. Allen was smiling. Well, Mr. Shaffer responded, hell, Bill, you can pick one up on the street corner in Baltimore, smiling, because we thought he was joking.

Westwood's opinion of Allen's comments directly clashes with those of Shaffer and Ziler.

A: I thought at first he was just talking to talk, but it went beyond that at a point that he was dead serious. I mean, he took me around to Shawn Grove's house.

. . . . .

Q: Did he ever do anything that made you believe he was serious or, as you say, dead serious?

A: Oh, yeah.

Q: What did he do?

A: He had their timetables down as to when they left their homes, where they lived, the time they went for walks, what time they went back.

Q: You refer to they. Who are you referring to?

A: Barry Levine and Shawn Grove.

Q: How do you know he had that information?

A: He took me there.

Westwood told the jury that Allen asked him to kill Grove and Levine.

Q: Mr. Westwood, you have indicated that you and the Defendant discussed killing these two people.

A: Right.

Q: And the Defendant brought it up first.

A: Yes.

Q: Did he ever ask you to kill these people?

A: Yes, he did.

Q: What was your response?

A: I didn't really give him a response. I didn't say yes; I didn't say no.

Eventually, Westwood told Allen that Westwood had a friend who would kill Grove and Levine.

Q: What exactly did you tell him? Did you mention any specifics?

A: That I had a friend that would kill them.

Q: Did you ever tell him that you could arrange to supply any of the materials involved in this?

A: The dynamite, yeah.

.    .    .    .    .

Q: Did you ever mention any specific names to him?

A: Yes, sir, I did.

Q: What was that name?

A: Michael Keogh.[7]

Word on the "street" was that Westwood had contracted to kill Grove and Levine.

A: Because the word was on the street that I was contracted to kill Barry Levine and Shawn Grove. I had knew [sic] at this point in time that if I didn't kill Shawn Grove and Barry Levine someone else was going to be killed or someone else was going to kill them and I was going to take the fall.

So, I was more or less covering my own behind there. I thought this thing had gone far enough.

In an act of preemptive self-preservation, Westwood contacted Sergeant Chester Miller of the Maryland State Police. Westwood informed Miller that Westwood would trade information if Miller would revoke or terminate Westwood's probation. Apparently, the State's Attorney agreed to terminate Westwood's probation; however, in actuality, it was only changed from supervised to unsupervised.

---

7. Westwood did have a friend named Michael Keogh. See *infra*, pages 740–741. Trooper Donald Newcomer assumed the alias "Michael Keogh" when he worked with Allen. We will designate Newcomer's use of the name by encapsulating it in quotation marks.

Miller contacted Newcomer of the Maryland State Police. Newcomer handled, primarily, solicitation for murder cases. Assuming the alias, "Michael Keogh," Newcomer prepared himself to meet Allen. Meanwhile, Westwood called Allen and left a message on Allen's answering machine; Allen did not respond. The second try at personal conversation with appellant was successful. Westwood informed him that "Keogh" was with Westwood, and that they were waiting for appellant at the Comfort Inn in Frostburg. Allen attempted to postpone the meeting, but eventually agreed to meet the pair in twenty minutes.

Newcomer, posing as "Keogh," met with Allen and Westwood three times: September 11, 1990, (twice); and September 21, 1990. The State, using the room next door for surveillance, recorded (audio and visual) the meetings.[8] The second meeting on the 11th was not videotaped because Allen came back to the room before the surveillance team had time to set up another video tape. We shall provide the relevant facts relating to these three meetings in our discussion *infra,* issue 1. D. The police arrested Allen some time after the third conference.

### 1. A.

In a kernel, appellant's first argument is that solicitation was *not* recognized as a common law crime *prior* to 1801 by the English courts,[9] and, therefore, his conviction violates Maryland Declaration of Rights article V.

That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law, and to the benefit of such

---

**8.** At trial, the State introduced the video and audio tapes. In addition, the State provided the jury with transcripts of these meetings. Judge Murphy informed the jury that the transcripts were not evidence, only the tapes were.

    Numerical digits will appear to the left of our quotations from the transcripts. The numbers are not line numbers, but rather are digit numbers to key into the tapes (presumably counter-numbers).

**9.** Solicitation to commit murder became a statutory offense. The Offences Against the Person Act, 1861, (24 & 25 Vict. c. 100), s. 4.

of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity; and also of all Acts of Assembly in force on the first day of June, eighteen hundred and sixty-seven; except such as may have since expired, or may be inconsistent with the provisions of this Constitution; subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State. And the Inhabitants of Maryland are also entitled to all property derived to them from, or under the Charter granted by His Majesty Charles the First to Caecilius Calvert, Baron of Baltimore.

*See State v. Canova,* 278 Md. 483, 486, 365 A.2d 988 (1976) ("The inhabitants of Maryland are constitutionally entitled to the common law of England.").

We have the authority to determine whether parts of the common law apply to the present situation. *Moxley v. Acker,* 294 Md. 47, 51, 447 A.2d 857 (1982) ("It is clear that it is proper for the judiciary to determine what part of the body of English court decisions and statutes are applicable to our situation today."); *see Ireland v. State,* 310 Md. 328, 529 A.2d 365 (1987). According to Chief Judge Chase, *State v. Buchanan,* 5 H & J 317, 362 (1821) (Chase, C.J., separate op.):

The common law of *England* is derived from immemorial usage and custom, originating from acts of parliament not recorded, or which are lost, or have been destroyed. It is a system of jurisprudence founded on the immutable principles of justice, and denominated by the great luminary of the law of *England,* the perfection of reason. The evidence of it are treatises of the sages of the law, the judicial records and adjudications of the courts of justice of *England.*

Appellant's contention only requires us to engage in academic dialogue; for Maryland courts *explicitly recognize* the common law crime of solicitation to commit mur-

der. *Lewis v. State,* 285 Md. 705, 722–23, 404 A.2d 1073 (1979); *Meyer v. State,* 47 Md.App. 679, 688–89, 425 A.2d 664, *cert. denied,* 290 Md. 718, *cert. denied,* 454 U.S. 865, 102 S.Ct. 327, 70 L.Ed.2d 166 (1981). Two sentences in *Cherry v. State,* 18 Md.App. 252, 257–58, 306 A.2d 634 (1973), have, in Allen's opinion, opened the door to attack his conviction. Judge Moylan, writing for this court, examined the common law crime of solicitation and its subsequent embrace by American jurisprudence.

> Its [solicitation's] first formulation, as something distinct from a mere aspect in the law of attempts, was in *Rex v. Higgins,* in 1801, 2 East 5, 102 Eng.Rep. 269. As persuasively declarative of pre-existing common law, *Rex v. Higgins* was followed by landmark decisions in *State v. Avery,* 7 Conn. 266, 18 Am.Dec. 105 (1828), and *Commonwealth v. Flagg,* 135 Mass. 545 (1883).

Without a doubt, *Rex v. Higgins,* 102 Eng.Rep. 269 (1801), is the leading English common law case on solicitation. Clark & Marshall, A Treatise on the Law of Crimes § 4.02 at 219 (7th ed. 1967); Rollin M. Perkins & Ronald N. Boyce, Criminal Law 648 (3d ed. 1982). In *Rex v. Higgins,* 102 Eng.Rep. 269 (1801), the court affirmed appellant's conviction for soliciting a servant to steal the servant's master's goods. The indictment charged that appellant "did falsely, wickedly, and unlawfully solicit and incite one James Dixon ... to take, embezzle, and steal a quantity of twist ... of the goods and chattels of his masters J. Phillips, &c...." The first of appellant's three assignments of error was that "the said count [upon which appellant was convicted] does not set forth any misdemeanor or offence [sic] which the justices of peace at their Quarter Sessions had jurisdiction to determine."

In *Higgins,* appellant's counsel, Mr. Topping, represented to the court that, except for cases of bribery, forgery, and perjury,

> [i]n none of the books is there any case or precedent to be found of an indictment for a bare solicitation to commit an offence without an act done in pursuance of it....

Lord Kenyon, Chief Justice, was decidedly of a different opinion. Citing an opinion by Lord Mansfield, *Rex v. Vaughan*, 98 Eng.Rep. 308 (1768), Lord Kenyon declared:

> It was a solicitation to the duke to commit a great offence against his duty to the King and the public. So it is here: and it would be a slander upon the law to suppose that an offence of such magnitude is not indictable. I am also clearly of [the] opinion, that it is indictable at the Quarter Sessions, as falling in with that class of offences, which, being violations of the law of the land, have a tendency, as it is said, to a breach of the peace, and are therefore cognizable by that jurisdiction.

Justice Grose prefaced his opinion by stating, "This is a very grievous offence, and it is most important to the public to be made known as such." He found three cases, *Rex v. Vaughan*, 98 Eng.Rep. 308 (1768); *Rex v. Plympton*, 92 Eng.Rep. 397 (1737); and *Rex v. Johnson*, 89 Eng.Rep. 753 (1678), instructive in deciding the case *sub judice*. Relying on those cases, Justice Grose concluded that "inciting another to commit a misdemeanor is itself a misdemeanor: a fortiori therefore it must be such to incite another to commit felony." Justice Lawrence found the doctrine Lord Mansfield laid down in *Rex v. Scofield*, Cald.Mag.Cas. 397 (1784),[10] directly on point.

> The doctrine laid down by Lord Mansfield in *R. v. Scofield*, which comprises all the principles of the former decisions, entirely governs the present case; that so long as an act rests in bare intention, it is not punishable by our laws; but immediately when an act is done, the law judges not only of the act done, but of the intent with which it is done; and if accompanied with an unlawful

---

**10.** Lord Kenyon and Justice Grose also cited *Scofield*. Counsel for the Crown represented to the court that in *Scofield*, the court held "that the attempting to set fire to a man's house, which is only a misdemeanor, was itself a misdemeanor per se, as much as an attempt to commit a felony, though differing in degree." Counsel for Higgins replied that Scofield attempted to set his own house on fire; he did not solicit another to do it.

and malicious intent, though the act itself would otherwise have been innocent, the intent being criminal, the act becomes criminal and punishable.

Lastly, Justice Le Blanc delivered his opinion, in which he distinguished two of appellant's cases, *Regina v. Callingwood*, 92 Eng.Rep. 239 (1694–1732), and *Regina v. Daniell*, 87 Eng.Rep. 856 (1704). He stated:

A solicitation or inciting of another, by whatever means it is attempted, is an act done; and that such an act done with a criminal intent is punishable by indictment has been clearly established by the several cases referred to.... And it appears to me that this is an offence tending to a breach of the peace, and is therefore indictable before that jurisdiction.

Justice Le Blanc reasoned that *Daniell* supported the proposition that persuading another to steal might be indictable. As to *Callingwood*, he believed that an action on the case did not lie there because the injury was private.

In sum, the court assumed that solicitation was an indictable offense if the object of the solicitation tended to breach the peace (public offense).[11] Members of the court recognized prior cases to support their opinions. For example, Lord Kenyon characterized *Vaughan* as a solicitation case and Justice Grose's opinion assumed that inciting someone to commit a misdemeanor is a misdemeanor.

In *Rex v. Johnson*, 89 Eng.Rep. 753 (1678), the court upheld an attorney's conviction for soliciting another to testify falsely.[12] Twenty-six years later, in *Regina v. Dan-*

---

11. LaFave and Scott suggest that the judges' opinions "rest more upon the policy of finding the acts to be an offense than upon whether the offense had previously existed in the common law." Wayne R. LaFave & Austin W. Scott, Jr. 2 Substantive Criminal Law § 6.1(a) at 4 (1986).

12. Perkins & Boyce, *supra,* at 648, say that the court classified Johnson's action as attempted subornation of perjury. See *Johnson,* 89 Eng.Rep. at 756 ("This is no subornation of perjury, but only an endeavour to procure one to get another to prove a writing forged....") (Jones, J., separate op.).

*iell,* 87 Eng.Rep. 856 (1704), the court held that the inciting of an apprentice or servant to leave his master is not a public offense, but inciting an apprentice or servant to steal his master's goods is an indictable offense.[13] Perkins and Boyce note that the opinion does not state whether the incitement would be indictable if the servant refused the proposition. Perkins & Boyce, *supra,* 486 n. 7.

*Regina v. Collingwood,* 87 Eng.Rep. 1029 (1704), followed in the same year. In that case, the court held that an action for inciting an apprentice to embezzle his master's goods could not be maintained unless there is evidence that the apprentice took the goods.

In *Rex v. Plympton,* 92 Eng.Rep. 397 (1737), the court affirmed appellant's conviction for promising to pay William Hewitt to vote in an election.

In *Rex v. Vaughan,* 98 Eng.Rep. 308 (1769), appellant was convicted for trying to bribe the Duke of Grafton into selling a position of the office of the clerk of the Supreme Court of Jamaica. Vaughan's counsel argued that the case was controlled by statute [14] and that the act charged could not have been punishable at common law. They stated:

> Therefore if the act had been done, and the proposal carried into execution, it would not have been punishable at common law. Much less then, can the mere solicitation to do it be so; no act being done, in consequence of it.

> There is one case of a solicitation to commit perjury, none being actually committed; in ... *Rex v. Johnson,* an attorney. But this is a single case, and very imperfectly reported.

Messrs. Dunning, Wallace, and Ranby, for the prosecution, took the opposite position.

> To solicit and counsel the committing of a crime, is criminal. As to the case of *Rex v. Johnson,* ... it shews

---

13. The second issue was determined upon want of venue.

14. Messrs. Wedderburn and Lee argued that the act at issue did not apply to the colonies (Jamaica).

that the charge was considered as an offence; though the Judges differed about the measure of the punishment.

As to what has been urged about this solicitation not being criminal, because there was no act done in consequence of it—the case of *Rex v. Plympton,* ... is in point: for, that does not appear to be a promise accepted, or the money paid. This very exception, "that the promise was no crime, without shewing the fact done," was taken and over-ruled.

Lord Mansfield, in *Vaughan,* reasoned that:

Wherever it is a crime to take, it is a crime to give: they are reciprocal. And in many cases, especially in bribery at elections to Parliament, the attempt is a crime: it is complete on his side who offers it.

If a party offers a bribe to a Judge, meaning to corrupt him in a case depending before him; and the Judge taketh it not; yet this is an offence punishable by law, in the party that offers it.... So also a promise of money to a corporator, to vote for a mayor of a corporation; as in *Rex v. Plympton.* And so also must be an offer to bribe a Privy Counsellor, to advise the King. (Footnote omitted.)

Therefore it appears to me that this is a misdemeanor.

In 1702, the court considered a procedural issue raised by the defendant Darby. *Regina v. Darby,* 87 Eng.Rep. 1121 (1702). The information against Darby charged him with soliciting a witness to testify consistent with that witness' prior testimony, and soliciting a second witness to swear to a particular thing. On the second point, Holt, Chief Justice, stated:

But as to the other point, it seemed to be a common-law offence, to offer money to swear to a particular thing whether true or false. (Footnote omitted.)

In *Mr. Bacon's Case,* 83 Eng.Rep. 341 (1660–1697), the defendant was indicted for intending to murder the Master of the Rolls, and for offering money to another to commit the act. Allegedly, the defendant told the other person that

if that person would not commit the act, the defendant would do it himself. The defendant was convicted, and subsequently appealed the decision. On appeal, he argued that the intent to commit a felony is not indictable. The court affirmed, and stated:

> [A]nciently the will was reputed or taken for the deed, in matters of felony; and tho' it is not so now, yet it is an offence and finable....

The opinion is not clear as to what part the solicitation of another played in defendant's conviction.

*Hicks's Case,* 80 Eng.Rep. 362 (1612), also decided in the seventeenth century, touched upon the provocation of another to act. The debate in *Hicks's* revolved around a letter containing taunts which the defendant sent to Sir Baptist Hicks. The Star Chamber found no libel due to want of publication, but the Star Chamber, nevertheless, fined the defendant, sentenced him to "wear papers," and ordered him to "make his submission to Sir Baptist Hicks" because his action "is a provocation to a challenge, and breach of the peace."

Professors LaFave and Scott concisely summarize the pre-*Higgins* cases. LaFave & Scott, *supra,* § 6.1(a) at 3–4 (footnotes omitted).

> Whether the offense of solicitation was known to the common law before the nineteenth century is uncertain. In one early case it was held that a man could not be indicted for simply requesting a servant to leave his master's service,[15] although the opinion states that inciting a servant to embezzle his master's goods would be indictable. Shortly thereafter, however, it was held in another case that no offense was charged where it was not alleged that the servant actually took the goods.[16] Only two special types of solicitation were clearly indictable under the early cases: solicitation to commit a for-

---

**15.** *Regina v. Daniell,* 87 Eng.Rep. 856 (1704).

**16.** *Regina v. Collingwood,* 87 Eng.Rep. 1029 (1704).

.

gery to be used in trial or perjury; [17] and the offering of a bribe to a public official. [18] (Original footnotes omitted.)

The cases discussed support Judge Moylan's statement that *Higgins* is "persuasively declarative of pre-existing common law...." *Cherry,* 18 Md.App. at 258, 306 A.2d 634. The pre-*Higgins* cases suggest that solicitation was punishable at common law prior to 1776. Specifically, solicitation to commit forgery and perjury were the only two special types of solicitation indictable at common law. La-Fave & Scott, *supra,* § 6.1(a) at 4. In addition, pre–1776 dictum indicates that inciting a servant to steal his master's goods was indictable. *See Regina v. Daniell,* 87 Eng.Rep. 856 (1704). Thus, the opening appellant "perceives" in *Cherry,* in our opinion, is truly illusory.

### 1. B.

Our resolution of the first issue against appellant's position makes discussion of his second issue unnecessary.

### 1. C.

Appellant implores us to reverse his conviction because, he contends, solicitation is a species of attempt. He cites *Lamb v. State,* 67 Md. 524, 10 A. 208 (1887), for the proposition that solicitation is a species of attempt. Allen's reading of *Lamb* is erroneous.

In *Lamb,* the Court of Appeals reversed John C. Lamb's conviction for soliciting a pregnant woman to take certain drugs which would induce an abortion. The Court equated solicitation with attempt when it considered whether the object of a solicitation can be a misdemeanor. *Lamb,* 67 Md. at 533–34, 10 A. 208.

But the acts charged upon the traverser in the second count are not comprehended in the terms of the statute. The charge is that the traverser solicited a pregnant

---

**17.** *Rex v. Johnson,* 89 Eng.Rep. 753 (1678).

**18.** *Rex v. Vaughan,* 98 Eng.Rep. 308 (1768).

woman to take certain drugs for the purpose of causing an abortion. It is not stated that she took the drugs. The act is germane to those prohibited by the statute. It is an effort by solicitation to cause means to be used for a guilty purpose. It may be urged that a solicitation is an attempt, and that an attempt to commit a misdemeanor is a misdemeanor. Pursuing the same train of inference and reasoning, we may go a step further, and maintain that as the solicitation is a misdemeanor, an attempt at solicitation would, by the same rule be a misdemeanor. This process might be indefinitely extended, so as to reach persons very remotely separated from the act which the statute intended to punish.

■ The Court concluded that the Legislature did not intend to punish Lamb for his actions and that the common law did not proscribe his actions either. The Court, however, recognized a difference between attempts and solicitations of felonies. *Lamb*, 67 Md. at 534, 10 A. 208 (emphasis added).

It has frequently been stated that an attempt to commit a misdemeanor, is, by the common law, a misdemeanor. There are undoubtedly many instances in which this is true. But it cannot be maintained as a universal principle. The law has declared that an attempt to commit a felony, *or* a persuasion of another person to commit a felony, is a misdemeanor.

*Lamb* stands for the proposition suggested by the State: "*Lamb* ... simply rejected the notion that, in Maryland, the object of a solicitation can be a misdemeanor." *Cherry v. State*, 18 Md.App. 252, 259, 306 A.2d 634 (1973); *see* Clark & Marshall, A Treatise on the Law of Crimes § 4.04 at 224–26 & n. 78 (7th ed. 1967) (citing *Lamb*). Furthermore, in this century, we have affirmed convictions for common law solicitation to commit murder. *Meyer v. State*, 47 Md.App. 679, 688–89, 425 A.2d 664, *cert. denied*, 290 Md. 718, *cert. denied*, 454 U.S. 865, 102 S.Ct. 327, 70 L.Ed.2d 166 (1981). Therefore, we reject appellant's argument.

## 1. D.

■ Allen failed to renew his motion for judgment of acquittal after he presented evidence in his behalf. See Md.Ann.Code Article 27, § 593; Md.Rule 4–324. His actions have withdrawn the motion from our review. *Warfield v. State,* 315 Md. 474, 487, 554 A.2d 1238 (1989) ("When a defendant offers evidence on his own behalf after his motion for acquittal is denied, the motion is withdrawn and not subject to review."). Procedural defect aside, Allen's claim is meritless.[19]

On review, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *quoted in McMillian v. State,* 325 Md. 272, 289–90, 600 A.2d 430 (1992). At trial, the State played two video tapes and one [20] audio tape for the jury, in which Allen, Westwood, and Newcomer discuss killing Grove and Levine.

Newcomer told the jury that appellant had not made a decision during either the first or second meeting of September 11, 1990 to have Levine or Grove killed.[21]

Q [MR. BERNSTEIN FOR ALLEN]: ... Trooper, Dr. Allen left at the end of this brief audiotape [second meeting on September 11], did he not?

A: Yes, sir.

---

**19.** In his reply brief, appellant stresses that he "was repeatedly solicited by the State, and that, at best from the State's position, he finally acquiesced to the State's repeated importuning." This argument appears to implicate the defense of entrapment, but Allen does not raise that issue. *See Sparks v. State,* 91 Md.App. 35, 603 A.2d 1258 (1992) (thorough discussion of the defense of entrapment).

**20.** The State introduced one other audio tape which recorded the two telephone calls Westwood made to Allen on September 11, 1990.

**21.** No crime of solicitation where defendant stated that she would decide at a later date if she wanted the hit man to proceed. *State v. Gaines,* 431 So.2d 736 (Fla. 4 DCA 1983) (statutory offense).

Q: And at that time when he left there was no decision reached, was there? He was to give you the decision the next time after you met again after you scoped [studied] things out. Is that a fair statement?

A: Yes, sir.

Q: So, there was no agreement for a murder when Dr. Allen left on September 11th. There was only an agreement to scope things out [study the victims]?

A: (Nodding in the affirmative.)

Q: You have to answer orally, sir[.]

A: Yes, sir.

Appellant, did, however, inform Newcomer of appellant's predicament. The transcript from the first meeting makes that obvious.

165 NEWCOMER Lay the whole thing out for me. Tell me what's happening so I can get a picture of what's going on—he's (gesturing toward Westwood) given me, but he was drinking when he was telling me, so I want it from you straight.

178 ALLEN Well I've just got a district attorney who's really got a hard-on for me, you know. He set me up, they've done a lot of illegal things against me, and I need the problem eliminated one way or another and Larry came up with a few ideas and suggested maybe you could help or whatever.

Allen came to the hotel room expecting to meet a hit man; Newcomer played the part well. He told appellant that he did not want to use dynamite in the killings. Newcomer was referring to the discussions between Westwood and Allen about using dynamite to kill or maim Levine and Grove. Shortly thereafter, appellant vacillated when Newcomer asked appellant how he proposed to eliminate his "problems."

256 NEWCOMER How do you propose to do that?

257 ALLEN (looking toward Westwood) I don't really have any proposals.

Newcomer directly asked Allen if he wanted a "job" done. Appellant responded by asking how much Newcomer charged "for something like this?" Newcomer quoted prices to appellant and asked him if they were agreeable. Appellant answered, "Yeah, I think so." Thereafter, appellant and Newcomer discussed the logistics of studying the intended victims. Appellant supplied Newcomer with $200 to start his nefarious operation.

At the second, unplanned meeting, appellant, once again, put off making a decision—but he still wanted Newcomer to proceed with his investigatory work. The tone of the third meeting, on September 21, was quite different from the first two. Allen relinquished his reserved role, apparently satisfied that he could trust Newcomer, and requested that Newcomer kill Levine first. This was but one of many steps that would convince the jury of appellant's guilt. Newcomer showed appellant the pictures Newcomer took of Grove and Levine. Allen was impressed.

160 NEWCOMER   This is the one [Levine] you want done [killed] first?

162 ALLEN   Right.

Newcomer explained to the jury that he would kill Levine first if Allen wanted. In addition, Newcomer was identifying Levine's picture. Appellant and Newcomer then proceeded to go over the logistics of the killing (*e.g.*, time frame, finances). Newcomer refused to continue the operation until Allen paid part of the purchase price in advance. Appellant handed to Newcomer ten one hundred dollar bills. At this point, Newcomer unequivocally stated the deal to Allen.

348 NEWCOMER   Alright.  Okay.  Now, I'm not going to talk to you anymore.  When you walk out this door, Levine is dead.  You understand that?

360 ALLEN   Um-hum.

362 NEWCOMER   At the end of that, at the end of that I collect four grand.

366 ALLEN   Right.

367 NEWCOMER Alright. And then we'll discuss Grove later on. You want ...

ALLEN Well ...

NEWCOMER ... to set him [his killing] back until January?

ALLEN Right, something like that.

Newcomer told the jury that the deal had been completed. Additionally, he explained to the jury that he used that language to provide Allen one last chance to "back out" of the deal.

Allen and Newcomer deliberated on which date Newcomer should kill Levine. Appellant suggested that Newcomer wait till appellant left town. Newcomer told Allen that Newcomer would carry out his end of the deal once he had word from Allen that Allen's trip was on. To make sure there was no confusion, Newcomer reconfirmed the agreement.

Appellant cites numerous cases in an effort to convince us that acquiescence to the State's offer to commit an illegal act is not solicitation. *Shannon v. United States,* 311 A.2d 501 (D.C.1973) (prostitution); *State v. Walker,* 247 N.W.2d 1 (Iowa 1976) (prostitution); *State v. Jackson,* 381 So.2d 454 (La.1980) (prostitution); *State v. Trump,* 381 So.2d 452 (La.1980) (prostitution); *People v. Salazar,* 140 Mich.App. 137, 362 N.W.2d 913 (1985) (homicide); *State v. Howard,* 7 Ohio Misc.2d 45, 455 N.E.2d 29 (Hamilton County Munc.Ct., Ohio 1983) (prostitution). All those cases are controlled by statute.[22] *Salazar* comes the closest to appellant's circumstances.

In that case, the Michigan Court of Appeals reversed the lower court's decision, and vacated Domingo Salazar's convictions. Following a bench trial, Salazar was found guilty

---

22. In Maryland, the definition of solicitation varies depending on whether the crime is common law solicitation or solicitation for the purpose of prostitution, lewdness or assignation. *In re Appeal No. 180, Sept. Term, 1976,* 278 Md. 443, 365 A.2d 540 (1976); see Md.Ann. Code Article 27, § 15(e).

of two counts of inciting, inducing, or exhorting another to commit murder. On appeal, the court considered, *inter alia*, an insufficiency of the evidence claim on the solicitation convictions.

Rumors began to circulate in 1981, while Salazar was in jail on another conviction, that Salazar wanted to kill two state police detectives that testified against him. Local authorities arranged to have a police informant incarcerated along with Salazar so as to investigate the rumors. Eventually, the informant, Isidro Martinez, Jr., struck up a friendship with Salazar. Salazar told Martinez that his appeal was pending, and that he was going to talk to one of the police officers in an attempt to have him tell the truth at the "appeal trial." Martinez informed Salazar that he had a brother-in-law who, for a fee, would break a person's arm to prompt him to tell the truth. Salazar refused the offer and indicated that he intended to take care of the officers for good (or words to that effect). Martinez responded that his brother-in-law and his cohorts would do the job. Salazar chose to "see what happens." Martinez also informed the court that Salazar told him that Salazar had been in the Army Special Forces and that he knew how to build demolition bombs. According to Martinez, Salazar wanted to dispatch the police officers by way of a car bomb. Salazar had all the materials save the plastic explosive needed. Shortly thereafter, Martinez informed Salazar that his friend had the explosive and wanted a "fair" price for it. Salazar allegedly told Martinez that he had a friend who would handle the payment aspect of the explosive transfer. Martinez arranged for a meeting between Salazar and Martinez's brother-in-law, however, Salazar did not show up and told Martinez that he did not want to meet with anybody. Martinez also testified that he asked Salazar if he could have the murder contract; Salazar responded in the affirmative. He, nevertheless, postponed discussion of the deal because he did not want to have a dialogue in jail.

Salazar, taking the witness stand, testified that Martinez constantly questioned him about his case. In short, Mar-

tinez was a gadfly. Salazar added that Martinez repeatedly told him that he should kill the police officers and that Martinez's friend would break their legs or inflict some other injury. Salazar became suspicious of Martinez and checked into his background. Moreover, Salazar believed that Martinez altered the tape recordings he made by taping a question, turning off the recorder, and then turning it on again while Salazar responded to another question.

The Michigan Court of Appeals determined that Martinez did the "inciting, inducing, and exhorting, and in the main the defendant was only responding to Martinez's solicitations." Martinez arranged for the meeting between Salazar and Martinez's brother-in-law—Salazar did not want to attend and did not. When Salazar failed to show for the meeting, Martinez suggested that he could procure the explosive. In response to that suggestion, Salazar asked Martinez to bring him a sample. The Court noted that Martinez, on cross-examination, admitted that he was the one who solicited Salazar to participate in the crime and not the other way around. *Salazar*, 362 N.W.2d at 918–19.

In *Salazar*, Martinez admitted to soliciting Salazar. In fact, Salazar testified that Martinez suggested that Salazar should kill the police officers. A careful reading of the record in the instant case suggests the converse.

A rational trier of fact could have found, and did find, the essential elements of the crime, as laid out in *Cherry v. State*, 18 Md.App. 252, 257, 306 A.2d 634 (1973), beyond a reasonable doubt. Allen's role in this affair was chameleon-like. At first he vacillated, yet at the same time, he probed Newcomer for details regarding his price, experience, and methods. He did not immediately solicit for the killings, but, in the meanwhile, he wanted Newcomer to conduct his surveillance operations. The transcript from the first meeting on September 11, 1990 makes this obvious.

1400 NEWCOMER Okay (shaking hands) you're calling the shots, I'll tell you what I think.

1405 ALLEN Well, you're the boss.

1406 NEWCOMER  Well, but I'm working for you, okay, that's the way we do it ... if I'm if ... I'll clock [study] him, I'll get his patterns down, when I feel comfortable with that, you and I'll meet again.

1424 ALLEN  Okay.

.     .     .     .     .

1456 NEWCOMER  Okay, okay.  The clock's rolling tonight, we're gonna [sic] get goin', I'll, I'll check this guy out first.  When I feel comfortable with him, the next time I see you I'll show you a picture of this guy to make sure that we're right on the, on the button, the same guy.

1484 ALLEN  Uh-huh.

1485 NEWCOMER  I'll tell you how I plan to do it, maybe you don't want to know that?

1490 ALLEN  No, I don't.  The less I know, I won't even know if you did it or not.

1495 NEWCOMER  There you go.  Okay.

1498 ALLEN  In fact, you know, I'll be happy if you just do it, and you know, just not tell me anything.

Allen attended the meetings (the first on short notice) knowing full well that the man he was dealing with was a self-proclaimed hit man who murdered people for a living. Appellant provided Newcomer with the money to start his surveillance, a phone number (and time to reach him), and descriptions of the intended victims.  Allen did not stop there, for he counseled Newcomer as to when he should carry out the first killing.  Allen set the time frame, and even held back on paying Newcomer the full downpayment until Newcomer completed his assignment.

Judge Moylan, quoting Clark and Marshall, set forth the elements of solicitation in *Cherry*, 18 Md.App. at 257–58, 306 A.2d 634.

The gist of this offense is incitement.  In brief, the gravamen of this common-law misdemeanor lay in counselling, enticing, or inducing another to commit a crime. . . .

In *Monoker v. State,* 321 Md. 214, 220–21, 582 A.2d 525 (1990), Judge Cole stated:

In other words, the person accused of solicitation must make an effort to coerce someone else into committing a criminal offense.

. . . . .

The gravamen of solicitation is inducement by the solicitor of another person.

■ In sum, the evidence was sufficient to show that appellant solicited Newcomer to murder Levine.

### 1. E.

■ Appellant urges us to hold that the evidence was too vague and indefinite to sustain his conviction. He maintains that the State produced *no* evidence of appellant's intention to be away at a hospital during the time "window" appellant contracted Newcomer to kill Levine. Therefore, Allen contends, the inference is strong that Allen was not going to leave town. See *Eley v. State,* 288 Md. 548, 555–56, 419 A.2d 384 (1980). In short, Allen argues that "one cannot be thought of as having incited others to do something conditional upon a not-existing event." At first glance, appellant's argument is intriguing. Nevertheless, upon closer scrutiny, it must fail. The failure to satisfy a condition precedent, in this case Allen's out-of-town trip, does not prevent the completion of a solicitation. *Gardner v. State,* 286 Md. 520, 529, 408 A.2d 1317 (1979) ("Neither a final direction to proceed nor fulfillment of conditions precedent (payment of money) was required. The gist of this offense is incitement."); *Gardner v. State,* 41 Md.App. 187, 201, 396 A.2d 303, *aff'd,* 286 Md. 520, 408 A.2d 1317 (1979) ("The crime of solicitation requires neither a direction to proceed nor the fulfillment of any conditions. It is, in essence, asking a person to commit a crime."). The evidence adduced at trial was sufficient to show that appellant solicited Newcomer.

### 1. F.

Westwood testified that appellant requested Westwood to kill Grove and Levine. Allen and Westwood discussed a price, method, and killer. On the witness stand, Newcomer testified that the police wanted to confirm and establish the details of the solicitation Allen made to Westwood.

Q: And in these meetings or videotaped meetings, you were going to confirm and establish and work out the details for the solicitation that Allen had allegedly made of Westwood. Is that correct?

A: That's correct.

Newcomer's explanation of his actions in the undercover meetings with Allen establish that Newcomer patiently waited for and received Allen's request that Newcomer kill Levine. Consequently, the undercover meetings were not only to "firm up," as appellant states, the terms of appellant's earlier solicitation of Westwood, see *Frye v. State*, 62 Md.App. 310, 316–17, 489 A.2d 71, *cert. denied*, 303 Md. 618, 495 A.2d 837 (1985), but to allow appellant, if he so chose, to solicit Newcomer.

### 1. G.

■ Allen declares that his indictment was duplicitous because it charged "two crimes, i.e., solicitations on both September 11th and September 21st." *See Ezenwa v. State*, 82 Md.App. 489, 499 n. 6, 572 A.2d 1101 (1990) ("A charging document is duplicitous if it charges more than one offense in a single count."). Both counts of the indictment charged that appellant "from on or about the 11th day of September, 1990, through on or about the 21st day of September, 1990, in Allegheny County, unlawfully did solicit one Donald A. Newcomer to commit a certain felony, to-wit: Murder of...." The State argues that Allen waived any right to claim error on this issue because he did not raise the issue prior to trial. See *State v. Beers*, 21 Md. App. 39, 44, 318 A.2d 825 (1974); Md.Rule 4–252(a)(b). The first instance Allen raised this issue was when he moved for judgment of acquittal. Thus, the issue is waived.

██ Even if appellant had not waived this issue, we still would not adopt his position. The indictment charged Allen with solicitation *between* September 11, 1990 *and* September 21, 1990,[23] *not*, as Allen reads it, solicitation of Newcomer *on* September 11 and September 21.[24] See *supra*, issue 1. D. and the testimony related thereto.

## 2. A.

██ Appellant declares that the trial court's instructions on solicitation were erroneous. Specifically, he questions the court's definition of solicitation and suggests that his proposed instructions accurately reflected the law.

In relevant part, the trial court defined the elements of solicitation:

Now, the Defendant has been charged in this case with the crime of solicitation to commit murder. In order to convict the Defendant of the charge of solicitation, you must be persuaded beyond a reasonable doubt that the Defendant in this case induced or requested another person to commit the crime of murder, and you must be persuaded beyond a reasonable doubt that at the time the Defendant made the request or at the time the Defendant offered the inducement the Defendant intended that the murder would be committed. The crime of solicitation is in the conduct of the person who requests or induces another to commit the crime. It is not necessary, of course, that the crime actually be committed. The crime is in the inducement or in the requesting.

Judge Bishop, in *McCallum v. State*, 81 Md.App. 403, 410, 567 A.2d 967 (1990), *aff'd*, 321 Md. 451, 583 A.2d 250 (1991), summarized the law governing the trial court's duty

---

**23.** Allen first met with "Keogh" on September 11. The police arrested appellant on the 21st.

**24.** The circumstances, not the number of potential victims, determine the number of solicitations. *Meyer v. State*, 47 Md.App. 679, 688–89, 425 A.2d 664, *cert. denied*, 290 Md. 718, *cert. denied*, 454 U.S. 865, 102 S.Ct. 327, 70 L.Ed.2d 166 (1981).

to give jury instructions when requested by a criminal defendant:

> Trial judges are required, upon the request of any party, to instruct the jury as to the applicable law and to give a requested instruction which correctly states the law if it has not been fairly covered in the instructions actually given.

*See* Md.Rule 4–325; *Manuel v. State*, 85 Md.App. 1, 24–25, 581 A.2d 1287 (1990), *cert. denied*, 322 Md. 131, 586 A.2d 13, 14 (1991). The trial court's use of the words "request(ed, ing)" and "induce(s, ed, ment)" amply conveyed to the jury the proper elements of the crime of solicitation; they are not "weak words" as appellant contends. *Cf. Monoker v. State*, 321 Md. 214, 217, 582 A.2d 525 (1990); *Gardner v. State*, 286 Md. 520, 529, 408 A.2d 1317 (1979); *Lewis v. State*, 285 Md. 705, 723, 404 A.2d 1073 (1979); *Frye v. State*, 62 Md.App. 310, 316–17, 489 A.2d 71, *cert. denied*, 303 Md. 618, 495 A.2d 837 (1985); *Meyer v. State*, 47 Md.App. 679, 688–89, 425 A.2d 664, *cert. denied*, 290 Md. 718, *cert. denied*, 454 U.S. 865, 102 S.Ct. 327, 70 L.Ed.2d 166 (1981); *Gardner v. State*, 41 Md.App. 187, 201, 396 A.2d 303, *aff'd*, 286 Md. 520, 408 A.2d 1317 (1979); *Cherry v. State*, 18 Md.App. 252, 258, 306 A.2d 634 (1973); Maryland Criminal Pattern Jury Instructions 4:31 at 399 (1987).

Thus, the trial court was correct to refuse appellant's proposed instructions.

### 2. B.

The trial court instructed the jury on Allen's "predisposition" to commit the crime of solicitation. He posits that predisposition "has no place in solicitation law and unduly confused matters." We disagree. The trial court injected "predisposition" into the following portion of the jury instructions.

> So, the question is was the Defendant predisposed to commit this crime and simply given an opportunity to commit a crime he was supposed to commit by the State police, in which case he would be guilty of solicitation, or

on the other hand is this a situation where the Defendant wished harm to come to somebody he would never have paid money but for the inducement made to him by Westwood and thereafter by the undercover officer.

For you to convict the Defendant in this case you must be persuaded beyond a reasonable doubt that he was predisposed to commit the crime of solicitation and that what happened in this case was through good fortune and good police work he was afforded an opportunity to do something and he did what he was predisposed to do. If you are persuaded beyond a reasonable doubt that this is the situation, the Defendant was predisposed to induce or request someone to commit the murder, the fact that the opportunity was afforded him as a result of his conversations with an undercover State trooper doesn't afford a defense.

Allen objected to this instruction because he believed that predisposition is not an element of solicitation.

MR. BERNSTEIN [COUNSEL FOR ALLEN]: ... Number three, I take exception to the last instruction that Your Honor gave on predisposition. I'm not aware that predisposition is an element in solicitation....

As the State points out, the trial court's explanation ran more toward Allen's mental state and the possible defense of entrapment. See *Sparks v. State*, 91 Md.App. 35, 603 A.2d 1258 (1992) (thorough discussion of the defense of entrapment). The jury could *not* convict Allen on predisposition alone; the trial court enunciated that the jury could convict Allen if "he did what he was predisposed to do."

■ Appellant also maintains that the trial court further confused the jurors by saying:

Also, a Defendant is not guilty of the crime of solicitation because the Defendant has a state of mind that is hopeful that the harm would come to another. Wishing harm to another, hoping that harm would come to another does not make someone guilty of the crime of solicitation.

So, the fact that someone hopes another person might be killed doesn't make the person guilty of solicitation.

We understand these sentences differently than Allen. Solicitation requires more than an intent to commit a crime: there must be an act (*e.g.*, an inducement, enticement, urging, commanding, requesting....). The trial court's use of the term predisposition proposed to the jury that appellant have the requisite intent to harm another; thus negating any defense that the State induced Allen. Furthermore, the trial court coupled those instructions with the requirement that appellant enliven his thoughts by asking another to bring them to fruition.

### 2. C.

Appellant next takes issue with the trial court's decisions not to give the jury specific instructions regarding Westwood's criminal record or his status as an accomplice, as an informer, and as a drug abuser, all of which, appellant claims, reflect on Westwood's credibility. We hold that the trial court properly denied Allen's requested accomplice instruction; the court erred by not granting Allen's requested instructions regarding Westwood's prior convictions, drug use and abuse, and status as an informer. The improper refusals, nevertheless, were harmless beyond a reasonable doubt. We explain.

The trial court, ignoring Allen's requests, gave the jury a general instruction on witnesses' credibility.

Now, in determining what testimony should be believed, carefully consider all of the evidence presented as well as the circumstances under which each witness has testified. You may wish to apply the following considerations:

How did the witness behave on the stand; was there anything unusual about the way in which the witness testified; how intelligent was the witness; how accurate was the witness' memory; how good was the witness' opportunity to see or hear the things about which he or she testified; did the witness appear to be telling the

truth; did the witness have a motive not to tell the truth; does the witness have an interest in the outcome of the case; `was the witness' testimony consistent, by that I mean did the witness contradict himself or herself while testifying; and was the witness' testimony supported or contradicted by other evidence in the case?

### Westwood's prior convictions

If Allen had his way, *Manuel,* 85 Md.App. at 25, 581 A.2d 1287 (instruction on prior conviction), the jury would have considered many more instructions, including the following instruction.

You have heard the testimony of Lawrence [sic] Westwood, who was previously convicted of a crime, involving dishonesty or false statement. This prior conviction was put into evidence for you to consider in evaluating Mr. Westwood's credibility. You may consider the fact that Mr. Westwood is a convicted felon in deciding how much of his testimony to accept and what weight, if any, it should be given.

That instruction, if given as requested, would have instilled within the jury the idea that Westwood's "record," as elicited by each side, was placed in the record *solely* for the jury to gauge his credibility. That is not so. The State argues, quite plausibly, that appellant confided in Westwood partly because of Westwood's record. The trial court was not bound to give the jury Allen's instructions verbatim, *McCallum,* 81 Md.App. at 410, 567 A.2d 967; yet that court had a duty to supply the gist of that instruction because the general instruction did not specifically cover Westwood's convictions as relating to his credibility.

### Westwood's alleged accomplice status

Allen argues that the trial court should have given the jury his proposed "accomplice" instruction. He has the burden of production and persuasion on this point; our obligation is to view the sufficiency of the evidence. *Burroughs v. State,* 88 Md.App. 229, 594 A.2d 625 (1991).

In support of his position, appellant produces five factors, which, in his opinion, qualify Westwood as an accomplice. One, Westwood suggested placing a bag of lime upon Grove's body to speed up its decomposition. Two, Westwood did not accept nor turn down appellant's request that Westwood kill Grove and Levine; Westwood told Allen that Westwood had a friend (Michael Keogh) who would kill the two men, and that he, Westwood, would supply the dynamite. Three, Westwood visited his friend Keogh during the summer of 1990. Four, Westwood had a thought "deep inside" that he could be the middle man in the requested killings. Lastly, five, Westwood had agreed on a price for Levine's murder.

According to *Burroughs*, 88 Md.App. at 238, 594 A.2d 625, quoting *Foster v. State*, 11 Md.App. 40, 46, 272 A.2d 810, *rev'd on other grounds*, 263 Md. 388, 283 A.2d 411 (1971), *cert. denied*, 406 U.S. 908, 92 S.Ct. 1616, 31 L.Ed.2d 818 (1972), the generally accepted test to determine if a witness is an accomplice is whether the witness could be convicted for the offense, either as a principal or accessory before the fact. The evidence before us is insufficient to convict Westwood for soliciting Allen, Keough, or Newcomer. Westwood denied that he solicited Keogh or anyone else.

Q [MR. MONACO FOR THE STATE]: Did you ever consider arranging for the solicitation with Michael Keogh [the real Keogh]?

A: No, sir.

Q: Did you ever consider in any respect whatsoever the possibility of arranging it? Not necessarily with Michael Keogh, but in any way whatsoever. Did that thought ever enter your mind?

A: No. I never thought it was going to get to that point.

. . . . .

Q: Let me make sure we're clear on that. Did you ever act on that in any way other than contacting the State Police?

A: No. That was my act, contacting them.

Q: But you did think about that?

A: I don't know. I guess.

Westwood went to Miller with the information about appellant; Westwood knew Miller was associated with the police. Likewise, the evidence would not support Westwood's conviction for conspiracy—solicitation's "big brother," as put by Allen.

### Westwood's drug use and abuse

Allen also declares that the factual predicate existed for the trial court to give an instruction on Westwood's credibility as an addict. The evidence was abundant on this element. Westwood admitted to drug convictions, marijuana use, valium abuse, and other drug problems. See *supra,* note 4. The trial court's general instructions did not specifically address Westwood's relationship with drugs and the concomitant effect on his credibility as a witness.

### Westwood as an informer

The last of the four alleged errors relates to Allen's claim that Westwood was an informer, and, therefore, that Westwood's testimony was subject to greater scrutiny. *See Manuel,* 85 Md.App. at 25, 581 A.2d 1287. Westwood did receive remuneration for his aid and testimony. The State's Attorney saw to it that his probation was changed from supervised to unsupervised, not the termination or revocation that Westwood so eagerly desired. The evidence was more than sufficient to show that Westwood was an informer.

The United States Supreme Court, in *Lee v. United States,* 343 U.S. 747, 757, 72 S.Ct. 967, 973, 96 L.Ed. 1270 (1952), discussed the credibility concern raised when informers and those of their ilk are used by the prosecution.

The use of informers, accessories, accomplices, false friends, or any of the other betrayals which are "dirty business" may raise serious questions of credibility. To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions.

Maryland law is in accord. *Hamilton v. State*, 62 Md.App. 603, 617–19, 490 A.2d 763, *cert. denied*, 303 Md. 682, 496 A.2d 682 (1985).

By his own admission, Westwood was convicted of various crimes, used drugs, lied when propitious, and terrorized bars. He did not deny his past behavior.

Q [MR. BERNSTEIN FOR ALLEN]: When you go in with a check, whatever number of times it is, one hundred or two hundred or whatever, you go into [sic] a merchant and you take his merchandise and you write a check for it. Right?

A: Yes, I do.

Q: So, you are saying to that merchant, in effect, this check is good because I want your merchandise. Right?

A: Yeah.

Q: So, you lie to that merchant every time you do it, don't you?

A: Yeah.

Q: And you have done it one hundred, two hundred times, haven't you?

A: Yeah.

Q: Lying is nothing new for you, is it?

A: I guess not.

Furthermore, Westwood informed that jury that he first went to the police because he heard that the word on the street was that he had contracted to kill Grove and Levine. Instead of donating information to the police about Allen's motives, Westwood used the material to bargain for a revocation or termination of his probation.

■ In sum, Westwood took the witness stand as an admitted liar, drug user, convicted felon, informer, and as a man with something to gain from his testimony. The trial court should have granted Allen's requested instructions relating to Westwood's convictions, drug use, and status as an informer because the evidence was sufficient, *Mason v. State*, 12 Md.App. 655, 661, 280 A.2d 753, *cert. denied*, 263 Md. 717 (1971) ("It is true that it is incumbent upon the court, when requested in a criminal case, to give an advisory instruction on every essential question or point of law supported by the evidence."), and the general instruction did not cover these topics in the requested detail. The evidence was insufficient to present the jury with Allen's accomplice instruction. *Mason*, 12 Md.App. at 661, 280 A.2d 753 ("a request for an instruction is properly refused where there is no evidence to support it.").

Those three refusals, nevertheless, were harmless beyond a reasonable doubt. *Hunt v. State*, 321 Md. 387, 441, 583 A.2d 218 (1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991) (harmless beyond a reasonable doubt standard used).

In closing argument, the State mentioned Westwood's testimony which was not corroborated by the audio and video tapes. The State, nevertheless, argued to the jury that it could decide the case without the benefit of Westwood's testimony.

[MR. MONACO FOR THE STATE] I want you to keep something in mind when you go back there and deliberate about this case and when you evaluate the testimony of Larry Westwood. Quite literally, the State did not have to produce Larry Westwood. This case, I will argue to you, is sufficient to show a solicitation without Larry Westwood's testimony.

Our review of the transcripts and the trial testimony confirms the truth of Monaco's last sentence from the statement quoted above. The substance of Westwood's uncorroborated testimony became, in effect, surplusage when the State introduced the audio and video tapes, and Newcomer's

testimony. The transcripts from those tapes indicate that Allen solicited "Keogh" to kill Levine. Any doubt as to the essential elements of Westwood's testimony was dispelled by Allen's actions as recorded on the tapes (and displayed by way of the transcripts).

The jury was well aware of Westwood's reputation for lying, his convictions, drug abuse and use, informer status, and potential motives. Therefore, even though the trial court's refusals to provide the jury with appellant's instructions were errors, those errors were harmless beyond a reasonable doubt when one considers the general instruction on credibility that the trial court recited, in conjunction with the independent evidence which demonstrated that appellant solicited Newcomer to murder Levine, and the jury's unquestioned awareness of Westwood's convictions, drug use and abuse, and informer status.

### 2. D.

Appellant's last argument is that the trial court erred when it refused to present the jury with his instruction on law enforcement witness bias. He further contends that the trial court compounded its error during *voir dire*, when the court asked prospective jurors whether they had relationships with law enforcement personnel, and if that affiliation would prevent them from judging the case fairly. As the State denotes, Allen did not object to those questions during the *voir dire*. Accordingly, he is barred from raising that argument now. Moreover, appellant's position is weakened by the general instruction that the trial court gave the jury on witnesses. In our opinion, that instruction adequately covered the present request. *Manuel v. State*, 85 Md.App. 1, 24–25, 581 A.2d 1287 (1990), *cert. denied*, 322 Md. 131, 586 A.2d 13, 14 (1991).

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.