934 A.2d 949

**Anthony ALSTON**

v.

**STATE of Maryland.**

**No. 0156, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Oct. 3, 2007.

2

4

David P. Kennedy, Baltimore, for appellant.

Michael R. Braudes, Baltimore, for appellee.

Panel: ADKINS, WOODWARD, and CHARLES E. MOYLAN, JR., (Retired, Specially Assigned) JJ.

ADKINS, J.

What is the significance of the jury oath in a criminal trial? We answer that question as we decide Anthony Alston's challenge to his conviction for conspiracy to murder on the

**6**

ground that the jury was not sworn until after the State completed its case.

## Standard Of Review

We are reviewing the court's denial of appellant Alston's motion for a mistrial, as well as its failure to grant Alston's post-verdict motion for a new trial. The decision to grant a motion for a mistrial is a matter within the discretion of the trial judge. *See Hunt v. State*, 321 Md. 387, 422, 583 A.2d 218 (1990), *cert. denied*, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). A denial of a motion for mistrial will only be reversed on appeal when there was clear prejudice to the defendant. *See Johnson v. State*, 303 Md. 487, 516, 495 A.2d 1 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). This Court may reverse a denial of a new trial motion if the trial court made an error of law, or abused its discretion. *See Merritt v. State*, 367 Md. 17, 30–31, 785 A.2d 756 (2001).

## FACTS

Johnny Cabizza was shot and killed in Baltimore City on July 10, 2003. Anthony Alston was charged with first degree murder; second degree murder; conspiracy to murder; use of a handgun in the commission of a felony or crime of violence; and wearing, carrying, and transporting a handgun.

The State presented testimony from Shervin Easton, an alleged accomplice and coconspirator, at Alston's trial. According to Easton, Easton met up with Alston and another man, El, shortly after noon on the day of the incident. The three men gathered at Easton's workplace in Prince George's County and then drove to Baltimore, with Easton in his blue Ford van, and Alston and El in Alston's red Kia. Easton said the men went to Baltimore to "get some blow, some heroin, sniff."

When in Baltimore, the three men parked their cars and walked down Fulton Street to Edmondson Avenue. They approached a group of four or five teenagers sitting on a stoop

at the corner of Edmondson and an alley. Easton asked the teenagers if there was "anything out" and they told Easton "yes ... just walk around the corner." El stayed on the corner, and Easton and Alston walked around the corner. Easton testified that, when he and Alston went where directed, "a little guy ... pulled a pump shotgun from under a cardboard box and stuck it in [his] face." The man robbed him of his cell phone and $50.00. All of this happened with Alston standing about five to ten feet behind Easton.

Easton, Alston, and El returned to their cars after Easton was robbed. They drove around for a while and spotted the teenagers, but were unable to catch up with them. The men eventually drove to Easton's home in Anne Arundel County. At Easton's home, Alston said to Easton, "Hey boy, you want your stuff back[.]" Easton testified that he replied, "yes, you know, I would like to have my stuff back, you know." Alston then asked Easton for his gun, a Taurus .380, and the three men drove back to Baltimore in Alston's Kia.

When the men returned to Baltimore, they parked on West Franklin Street, near the location of the earlier robbery. According to Easton, he stayed in the car while Alston and El walked through an alley. After fifteen or twenty minutes, Easton heard two or three shots. Alston and El returned quickly, telling him to drive away. Alston told Easton that he did not have time to retrieve the phone.

Officers testified that they responded to a call about a shooting at approximately 5:00 p.m. that evening. The officers found Cabizza lying on the sidewalk on Edmondson Avenue. Cabizza was pronounced dead at the hospital from multiple gunshot wounds. The medical examiner testified that there was no evidence of stippling or soot, indicating that the shots were fired from more than two feet away. The examiner removed two large caliber bullets from the body. A crime lab technician testified that he removed three cartridge casings from the scene. A firearms examiner testified that the bullets and cartridges were all .380's, each coming from one

gun. The examiner also indicated that the gun was probably a Taurus or Beretta semi-automatic.

The State also presented testimony from three of Cabizza's friends: Brandon Sims, Ray Issac, and Kevin Morgan. Sims testified that he first encountered two men on July 10, 2003, while sitting with Issac and Morgan at the corner of Edmondson and Fulton. The two men asked them for drugs. Cabizza then came over and took the men down the alley. Sims did not see what happened in the alley, nor did he see the men come out. Sims said that the group left and then later returned to Edmondson Avenue. This time, a man came around the corner and "start[ed] firing or shooting and was like, give me my money back"; however, Sims did not see the man's face. Sims indicated he previously picked Alston's photograph out of a photo array because he thought he was the man who killed Cabizza.

Issac's testimony of the events at Edmondson Avenue that afternoon was similar to Sims' account. When the friends returned to Edmondson Avenue, Issac said that one person came out of the alley "real quick" saying, "Where's my mother-fucking money[?]" Issac indicated that the man then started shooting. Issac also did not see the man's face, but indicated that he had previously picked out Alston's photo as the "same guy in the red Jeep and the same guy who was there when Johnny got shot."

Morgan also gave an account of the July 10, 2003 events similar to Sim's and Issac's. Morgan first recounted that two men approached him and the others, with whom he was standing, earlier in the afternoon at the corner of Fulton and Edmondson. The men asked if they had any heroin. He and the others said no, but Cabizza then said he had some and told the two men to follow him to the end of the alley. The men followed Cabizza around the corner. Morgan then saw the two men come "skipping back around the corner" after a minute or two as if something had just happened to them.

Morgan then testified about his observations at the time of the shooting. He indicated that two men came out of the

alley. Morgan asked them if they wanted heroin and the men denied his offer. He thought that one of the men looked familiar. Morgan said that the two men walked toward the teens in an unusual way. The men then turned and walked away. But one of the men then turned around, pulled out a gun, and said "bitch, give me my money[.]" Morgan testified that he recognized this individual as one of the two men Cabizza had robbed, and that the second man was not one of the original two. Morgan said that he was only a short distance away. Morgan ran at this point and saw the shooter fire off the first shot. In court, Morgan identified Alston as the shooter.

## LEGAL PROCEEDINGS

Alston was indicted in the Circuit Court for Baltimore City on September 5, 2003. On June 10, 2004, Judge Ellen Heller heard and decided Alston's motions to suppress pretrial identifications. Judge Heller also presided over jury selection. Alston's case was tried before a jury on June 11, 14, and 15, 2004, with Judge John Glynn presiding.

The jury returned verdicts of not guilty on the charges of first and second degree murder, not guilty on the handgun charges, and guilty on the charge of conspiracy to murder. On March 23, 2005, Judge Glynn denied Alston's motions for a new trial, and then sentenced Alston to life in prison for conspiracy to murder. Alston appealed, asking us to consider the following questions:

I. Did the trial court err in denying Alston's motions for a mistrial and for a new trial where the jury was not sworn until after the essential conclusion of the State's case?

II. Did the trial court err in permitting an in-court identification by a witness whose pre-trial identification had been suppressed as the product of improper suggestion and not reliable?

III. Did the trial court err in sentencing Alston to life for conspiracy to murder where under the instructions

given the jury could have found Alston was guilty only of conspiracy to commit second degree murder?

IV. Was the evidence insufficient to sustain a conviction of conspiracy to murder where the only pertinent evidence was direct evidence from an alleged co-conspirator establishing at most an agreement to commit robbery?

We answer no to all four questions.

## DISCUSSION

## I.

### Jury Swearing

Md. Rule 4–312(h) requires that a jury be sworn. Although the rule does not specify what exact words comprise the juror's oath, the language typically used is the following:

> Ladies and gentlemen of the jury, please stand and raise your right hands to be sworn. You, and each of you, solemnly promise and declare you shall well and truly try, and a true deliverance make, between the State of Maryland and [Mr. Alston], whom you shall have in charge, and a true verdict give, according to the evidence.

On the morning of the third day of trial, June 15, 2004, defense counsel informed the court that the jury had not yet been sworn. Alston moved for a mistrial, and his motion was denied without prejudice. The circuit court then had the jury sworn, and inquired of the jury:

> Now, what I'm going to ask you individually, and I'll ask each of you in turn, is whether anything has occurred during the course of this trial or whether now, having been sworn in, you're aware of anything that in any way would interfere with your fulfilling of this oath and treating this oath as though it were administered at the beginning of this case. In other words, it's as though you were sworn in at the beginning of the case, you heard the oath, you swore to the oath, you're now under oath. **Is there anything that would interfere with or anything that has occurred or**

**would affect your ability to deliberate and decide this case in accordance with the oath you've just given, in accordance with the evidence in this case, in accordance with the law of the State of Maryland [?]** (Emphasis added.)

Then each juror was asked, "is there anything" and each replied "[n]o" with the exception of jurors number 2 and 7, whose responses were inaudible.[1] At this point, the court said:

Okay. I'm going to find that you have been duly sworn, that there has been no violation of the oath and that from as best as I can gather from the answers to your questions and the questions I have asked, you are able and have fulfilled that oath up to this point and will presumably fulfill that oath through the conclusion of this case.

The State then rested its case. After Alston's motion for judgment of acquittal was denied, Alston rested without putting on any evidence. When the jury returned a guilty verdict on the conspiracy to murder charge, Alston moved for a new trial on this same ground, which was denied.

Alston now contends that his motions for a mistrial and for a new trial should have been granted, arguing that a verdict by an unsworn jury has no legal effect. He sees the court's attempt to "cure" the error as insufficient, because the question to the jurors did not include an inquiry as to whether they considered themselves, throughout the trial, to be bound by the obligations of the juror's oath.

### Preservation Of The Issue

■ Although the State agrees that the jury was not sworn until after the last witness, it argues that this issue was not

---

1. With regard to the inaudible responses, we are satisfied that if any juror had answered the question in the affirmative, the court would have further investigated before proceeding with its statement: "I'm going to find that you have been duly sworn, that there has been no violation of the oath and that from as best as I can gather from the answers to your questions and the questions I have asked, you are able and have fulfilled that oath up to this point[.]"

properly preserved for our review, claiming that Alston waived his challenge to the unsworn jury because he failed to object at the **beginning** of trial. To support its argument, the State points to this Court's holding that the failure to object to *voir dire* questions constitutes waiver of the appellate issue. *See Allen v. State,* 91 Md.App. 705, 745–46, 605 A.2d 960 (1992), *cert. denied,* 327 Md. 625, 612 A.2d 256 (1992). *Allen* differs substantially from this case.

In *Allen,* the trial court asked the jury questions during *voir dire* regarding their relationships with law enforcement personnel, and their ability to judge the case fairly. Allen did not object to these questions until he appealed to this Court, when he argued that the trial court's failure to instruct the jury on law enforcement witness bias was compounded by the *voir dire* questioning. *See id.* In contrast, at the beginning of the third day of Alston's trial, June 15, 2004, defense counsel stated the following during her motion for a mistrial:

I would note for the record that it came to my attention when I was, you know, over-overnight. I asked the Court Clerk. It was reflected in the court file, the jury had been sworn, however, based on our further investigation it appears as though the jury was not sworn. So on behalf of Mr. Alston, I would make a motion for mistrial.

The issue is preserved.

### Jury Oath

We review here a conviction *not* by an unsworn jury, but by one that was belatedly sworn. Our threshold analysis, though, is the same as if the jury were never sworn, because in order to assess fully the consequences of an eleventh hour jury swearing, we must understand the purpose and import of the juror's oath. This is so because we need to decide whether a failure to swear the jury may be reviewed under the harmless error standard that the circuit court applied in denying the motion for a new trial.[2] We explain.

--------

2. The trial court reasoned as follows:

In *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991), the Supreme Court held that if an error in a criminal trial is considered a structural error or defect, a reviewing court cannot apply the harmless error standard. A structural defect or error is one that "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself[,] .... [and] 'transcends the criminal process.'" *Id.*, 499 U.S. at 310–11, 111 S.Ct. at 1265. Trial defects that the Supreme Court has held to be structural error include: deprivation of the rights to counsel at trial, to an impartial judge, to self-representation, and to a public trial, as well as unlawful exclusion of members of the defendant's race from a grand jury. *See id.*, 499 U.S. at 310, 111 S.Ct. at 1265. The types of trial error that the Supreme Court has held **not** to be structural include the admission of an involuntary confession, a defendant's statements obtained in violation of the Sixth Amendment or the Fourteenth Amendment, and an out-of-court statement by a non-testifying co-defendant. *See id.*, 499 U.S. at 309–311, 111 S.Ct. at 1265.

In *Payne v. Arkansas*, 356 U.S. 560, 568, 78 S.Ct. 844, 850, 2 L.Ed.2d 975 (1958), which involved the admission of an illegally obtained confession, the Supreme Court articulated that classification of the error or defect as structural or not will depend on whether the Court is able to say "what credit and weight the jury gave to the confession." Trial errors that have been considered "structural" are said to "defy analysis by 'harmless-error' standards." *Fulminante*, 499 U.S. at 309, 111 S.Ct. at 1265.

Speaking for the majority in *Fulminante*, Chief Justice Rehnquist explained that an involuntary confession, although

---

[M]y reaction is that it probably is quite harmless. I can't figure out why it would make any difference. In other words, I swore them as best I could eventually in a retroactive way. As I recall, I asked them, "Any issues with respect to being sworn now? Anything that you would have done previously that would have violated the oath?" And I did the best I could. And I think, frankly, it is quite harmless and irrelevant. So I'll deny the motion [on] that ground.

having a significant effect on the trial, was **not** structural because the harmless error test was readily applicable:

> Of course an involuntary confession may have a more dramatic effect on the course of a trial than do other trial errors-in particular cases it may be devastating to a defendant-but this simply means that a reviewing court will conclude in such a case that its admission was not harmless error; it is not a reason for eschewing the harmless-error test entirely.

*Id.*, 499 U.S. at 312, 111 S.Ct. at 1266. The Supreme Court has explained structural errors:

> Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. 'Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.'

*Id.* (citation omitted).

In *Redman v. State*, 363 Md. 298, 304 n. 5, 768 A.2d 656 (2001), a capital murder case, our Court of Appeals pointed out that structural error was found only in limited circumstances:

> As in the presumed prejudice cases, the Supreme Court has found an error to be structural and subject to automatic reversal in a very limited number of cases. Moreover, in those cases where the Supreme Court, and indeed other courts, have found structural error mandating automatic reversal, the errors appear to be of constitutional magnitude. Such defects include a defective reasonable doubt instruction, racial discrimination in grand jury selection, denial of a public trial, total deprivation of counsel, and a judge who is not impartial. (Citations omitted.)

It declined to apply a structural error analysis to Redman's *Strickland* claim that trial counsel was ineffective because he did not request removal to a different venue:

> Petitioner is inappropriately scrambling the eggs of *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d

302 (1991), and *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Fulminante* was a refinement of the federal harmless error analysis; *Strickland* involved an evaluation of counsel's performance and an assessment of prejudice. Our research has disclosed only one case actually applying structural error analysis as a part of the *Strickland* prejudice inquiry. *See McGurk v. Steinberg[Stenberg]*, 163 F.3d 470 (8th Cir.1998).

*Id.*

Instead, the Court required a showing of actual prejudice, as required by *Strickland*.[3] On the other hand, outside the *Strickland* context, in *Carter v. State*, 356 Md. 207, 224–25, 738 A.2d 871 (1999), the Court held that the trial court's closing of the courtroom during the testimony of a minor child sexual abuse victim, without making specific findings of fact justifying that closure, was structural error.[4] As we will discuss *infra*, the Court, in other cases, has held that certain types of error are presumptively prejudicial, without using the term "structural error."[5] It is not important in this opinion to

---

**3.** This Court applied the structural analysis in *Martin v. State*, 165 Md.App. 189, 205–06, 885 A.2d 339 (2005), *cert. denied*, 391 Md. 115, 892 A.2d 478 (2006), but decided that "the total failure to instruct [the jury] on a charged offense is not structural or fundamental error mandating reversal."

**4.** In *Carter v. State*, 356 Md. 207, 219–20, 738 A.2d 871 (1999), the Court explained:

[T]he trial court did not interview the child victim, or anyone else, for that matter, on the record to determine the effect that testifying in front of the petitioner, his family, other members of the public, or the media would have on the 14–year–old complainant. Nor did the trial judge take testimony or hear expert testimony to determine whether the child could, or would, suffer trauma, emotional distress, or embarrassment from testifying in open court. Furthermore, the trial court did not provide a case-specific discussion, on this record, of reasonable alternatives to closure. Instead, the trial court acted to close the courtroom on nothing more than a proffer by the State. As discussed above, these general statements are insufficient to demonstrate an overriding state interest or overcome the presumption of openness.

**5.** The Court of Appeals may view "structural error" as a subset of errors which carry presumptive prejudice. *Compare Stokes v. State*, 379

**16**

decide what difference, if any, there may be between presumptively prejudicial error and structural error, as either would mandate reversal. Thus, as we discuss the cases and their implications, we shall use the terms somewhat interchangeably.[6]

The Supreme Court recently affirmed the concept of structural error in *United States v. Gonzalez–Lopez,* 548 U.S. 140, 126 S.Ct. 2557, 2564 n. 4, 165 L.Ed.2d 409 (2006), in which the Court "rest[ed] [its] conclusion of structural error upon the difficulty of assessing the effect of the error." There, the Court held that erroneous deprivation of the right to counsel of choice was structural error because, in light of the "myriad aspects of representation, the erroneous denial of counsel bears directly on the 'framework within which the trial proceeds[.]' " *Id.* at 2564–65 (citation omitted). In its words:

> We have little trouble concluding that erroneous deprivation of the right to counsel of choice, "with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.' " Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad

Md. 618, 638, 843 A.2d 64 (2004) (holding that allowing alternate jurors to be present during deliberations was a presumptively prejudicial error, without discussing "structural error"), *with Carter,* 356 Md. at 224, 738 A.2d 871 (holding that denial of a public trial is a "structural defect").

**6.** This Court has explicitly applied a "structural error" analysis several times. *See, e.g., Harris v. State,* 173 Md.App. 71, 917 A.2d 1162 (2007), *cert. granted,* 399 Md. 592, 925 A.2d 632 (2007); *Martin v. State,* 165 Md.App. 189, 885 A.2d 339 (2005), *cert. denied,* 391 Md. 115, 892 A.2d 478 (2006); *Whitney v. State,* 158 Md.App. 519, 857 A.2d 625 (2004); *Walker v. State,* 161 Md.App. 253, 868 A.2d 898 (2005), *aff'd,* 391 Md. 233, 892 A.2d 547 (2006); *Rheubottom v. State,* 99 Md.App. 335, 345, 637 A.2d 501 (1993), *cert. denied,* 335 Md. 454, 644 A.2d 488 (1994).

aspects of representation, the erroneous denial of counsel bears directly on the "framework within which the trial proceeds[.]"

*Id.* at 2564 (citations omitted).

Conducting a criminal trial with an unsworn jury is a different type of error from any of those analyzed by the Supreme Court in the cases discussed earlier in this section. In those cases, the Court considered what effect the trial error had on the minds of the jurors in determining whether the State met its burden of showing guilt beyond a reasonable doubt. It was able to apply an objective standard in doing so, basing its decision on what other evidence the State presented that supported a conclusion that the defendant was guilty, and whether a juror could have maintained reasonable doubt about the defendant's guilt. Notably, harmless error only occurs when the State's proof is compelling. The question of whether a juror could have been influenced by not having taken an oath is a more elusive one, and will arise in cases that are not so clear-cut as those meeting the harmless error standard. It also requires understanding more about each juror, such as, what expectations and sense of obligation each has in undertaking his or her jury service, without having made the typically solemn promise to the court that she "shall well and truly try, and a true deliverance make ... and a true verdict give, according to the evidence."

We do not interpret the Supreme Court in either *Gonzalez–Lopez* or *Fulminante* as saying that difficulty in ascertaining prejudice from a constitutional error is, by itself, sufficient to qualify the error as "structural." Although the *Gonzalez–Lopez* Court said, "we rest our conclusion of structural error upon the difficulty of assessing the effect of the error[,]" 126 S.Ct. at 2564 n. 4, it prefaced that comment with a discussion of the importance and breadth of the Sixth Amendment right to counsel.[7] So, our next step is to examine the nature and

---

7. In response to the Government's argument that there was only prejudice if the defendant could show that substitute counsel was ineffective within the meaning of *Strickland v. Washington,* 466 U.S.

importance of the jury oath. We start that task by recounting briefly some history about the jury and its oath, followed by a review of some out-of-state cases discussing the purpose of the oath.

### History, Purpose, And Importance Of Oath

■ "From its earliest institution, the jury was formally sworn to declare the truth as between parties[.]" 1 Francis X. Busch, *Law and Tactics in Jury Trials* 9 (Encycl. ed.1959). The jury originated in 11th century England, "when it took the form of a group of the defendant's neighbors who were called in to answer questions from their own knowledge. Thus, jurors served as both witnesses and triers of the facts." Rita J. Simon, *The Jury: Its Role in American Society* 5 (1980). At the end of the 15th century, jurors began to function only as triers of the facts. *See id.*[8] The jury system came to America in 1607, in the Virginia colony of Jamestown. *See id.* "[T]he right to a trial by jury, of twelve persons, has been part of the common law for centuries, along with the requirement of unanimity. The right to trial by jury is guaranteed by the Maryland Declaration of Rights and the

---

668, 691–696, 104 S.Ct. 2052, 2066–70, 80 L.Ed.2d 674 (1984), the Court said:

> [T]he Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." So also with the Sixth Amendment right to counsel of choice. It commands, not that a trial be fair, but that a particular guarantee of fairness be provided-to wit, that the accused be defended by the counsel he believes to be best. "The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause." In sum, the right at stake here is the right to counsel of choice, not the right to a fair trial; and that right was violated because the deprivation of counsel was erroneous. No additional showing of prejudice is required to make the violation "complete."
> *United States v. Gonzalez–Lopez*, 548 U.S. 140, 126 S.Ct. 2557, 2562, 165 L.Ed.2d 409 (2006) (citations omitted).

**8.** Judge Harrell, writing for the Court, provides a more extensive history of the jury in ancient England in *Owens v. State*, 399 Md. 388, 407–14, 924 A.2d 1072 (2007).

Maryland Rules, as well as the United States Constitution." *Stokes v. State,* 379 Md. 618, 625–26, 843 A.2d 64 (2004).

Although historically established by legislation, today, Maryland's requirement that a jury be sworn is found in the Maryland Rules: "The jurors and any alternates to be impaneled shall be called from the qualified jurors remaining on the list in the order previously designated by the court and shall be sworn." Md. Rule 4–312(h).[9]

The swearing of the jury has been recognized as an integral step in the conduct of a criminal trial. Maryland courts have repeatedly declared that the swearing of the jury is the critical demarcation of when a trial commences for double jeopardy purposes. *See State v. Woodson,* 338 Md. 322, 329, 658 A.2d 272 (1995) ("The double jeopardy prohibition against retrial for the same offense attaches in a jury trial when the jury is empaneled and sworn"); *Blondes v. State,* 273 Md. 435, 444, 330 A.2d 169 (1975) ("with respect to a jury trial, a defendant is placed in jeopardy when the jury is selected and sworn") (citing *Illinois v. Somerville,* 410 U.S. 458, 467, 93 S.Ct. 1066, 1072, 35 L.Ed.2d 425 (1973), and other Supreme Court cases). The Supreme Court explained:

> When the trial of an indictment has been commenced by the swearing of the jury, the defendant is in their charge, and is entitled to a verdict of acquittal if the case on the part of the prosecution is, for any reason, not made out against him, unless he consents to the discharging of the jury without giving a verdict, or unless there is such a legal necessity for discharging them as would, if spread on the record, enable a court of error to say that the discharge was proper.

*Downum v. United States,* 372 U.S. 734, 738 n. 1, 83 S.Ct. 1033, 1036 n. 1, 10 L.Ed.2d 100 (1963) (citation omitted).

---

**9.** We have traced the requirement that a jury be sworn to an 1888 statute, which stated: "[T]he remaining twelve persons shall thereupon be immediately empanelled and sworn as the petit jury[.]" Former Md.Code (1888), Art. 51, § 15.

### Cases Emphasizing Importance Of Oath
### And Reversing Convictions

State courts outside Maryland have varied in their decisions regarding the effect of the failure to properly swear the jury at the start of a criminal trial. At least nine states have ruled that the omission of the jury oath is incurable error. *See Dyson v. Alabama,* 722 So.2d 782, 786 (Ala.Crim.App.1997); *California v. Pelton,* 7 P.2d 205, 206 (Cal.App. Dep't Super. Ct.1931); *Grant v. Georgia,* 272 Ga. 213, 528 S.E.2d 512, 513 (2000); *Steele v. Indiana,* 446 N.E.2d 353, 354 (Ind.Ct.App. 1983); *Michigan v. Pribble,* 72 Mich.App. 219, 249 N.W.2d 363, 368 (1976); *Miller v. Mississippi,* 122 Miss. 19, 84 So. 161, 163 (1920); *Missouri v. Mitchell,* 199 Mo. 105, 97 S.W. 561, 562 (1906); *Howard v. Texas,* 80 Tex.Crim. 588, 192 S.W. 770, 773 (1917); *West Virginia v. Moore,* 57 W.Va. 146, 49 S.E. 1015, 1016 (1905). These cases have focused largely on the important role that the oath plays.

As the Indiana court in *Steele* explained,

> The oath given to a jury prior to the commencement of a trial is not a mere formality. It is intended to impress upon the jury its solemn duty to carefully deliberate on the matter at issue. Most importantly the oath serves as a safeguard of a criminal defendant's fundamental constitutional right to trial by an impartial jury.

*Steele,* 446 N.E.2d at 354. In a similar vein, a Michigan court articulated:

> The oath is administered to insure that the jurors pay attention to the evidence, observe the credibility and demeanor of the witnesses and conduct themselves at all times, as befits one holding such an important position. The oath is designed to protect the fundamental right of trial by an impartial jury.

*Pribble,* 249 N.W.2d at 366.[10] "The weighty and responsible duties of jurors are impressed upon them by the force and

---

**10.** " 'The impartial jury' guaranteed by constitutional provisions is one which is of impartial frame of mind, [a]t the beginning of [a] trial, [and]

solemnity of an oath, which is administered generally after the full number have been obtained by challenge and examination." John Proffatt, *A Treatise on Trial By Jury, Including Questions of Law and Fact* 254 (1877).

In *Slaughter v. Georgia*, 100 Ga. 323, 28 S.E. 159, 160 (1897), the Georgia court explained the purpose and benefits of the oath:

> The solemnity of calling the juror before the prisoner, in the presence of the court, and his there taking the solemn oath prescribed by law to well and truly try and true deliverance make of that prisoner, **not only gives the prisoner a comfortable assurance that he is to have a fair and impartial trial, but has a salutary tendency to prepare the mind of the juror for the solemn duty he is assuming.** We think the jury should be sworn in each case. (Citation omitted and emphasis added.)

*Cases Affirming Convictions With No Oath Or Belated Oath*

Other jurisdictions have upheld verdicts despite a failure to swear the jury or a belated swearing of the jury. Many of these cases turned on the defendant's failure to object until after the verdict, which the courts considered a waiver of any objection. *See United States v. Hopkins*, 458 F.2d 1353, 1354 (5th Cir.1972); *Sides v. Indiana*, 693 N.E.2d 1310, 1312 (Ind. 1998); *Manix v. Mississippi*, 895 So.2d 167, 179 (Miss.2005); *Missouri v. Frazier*, 339 Mo. 966, 98 S.W.2d 707, 716 (1936); [11] *Minnesota v. Saybolt*, 461 N.W.2d 729, 737 (Minn.Ct.App. 1990); *New Mexico v. Arellano*, 125 N.M. 709, 965 P.2d 293, 295 (1998); *Oregon v. Vogh*, 179 Or.App. 585, 41 P.3d 421, 428 (2002); *South Carolina v. Mayfield*, 235 S.C. 11, 109 S.E.2d 716, 723–24 (1959), *cert. denied*, 363 U.S. 846, 80 S.Ct. 1616, 4

---

is influenced only by legal and competent evidence produced during trial[.]" *Michigan v. Pribble*, 72 Mich.App. 219, 249 N.W.2d 363, 366 (1976) (citations omitted).

11. Interestingly, in *Frazier*, the defendant never raised the issue. The State mentioned in its brief that the jury was not sworn and the court addressed the issue.

L.Ed.2d 1728 (1960); [12] *Hobbs v. Tennessee,* 121 Tenn. 413, 118 S.W. 262, 263 (1908); *Vermont v. Roberge,* 155 Vt. 121, 582 A.2d 142, 145 (1990). These waiver cases are conceptually different from those in which the court relies on harmless error because their outcomes rest on a defendant's failure to object, rather than a court's assessment *that the error made no difference.* Thus, none of these cases guide our decision, because Alston objected and asked for a mistrial before the verdict.

In other jurisdictions affirming convictions by unsworn juries, the defendants objected before the verdict, and the courts found the error was harmless because the jury ultimately took the oath before the verdict, albeit belatedly. *See Cooper v. Campbell,* 597 F.2d 628, 629 (8th Cir.), *cert. denied,* 444 U.S. 852, 100 S.Ct. 106, 62 L.Ed.2d 69 (1979); *Garner v. Alabama,* 206 Ala. 56, 89 So. 69, 70 (1921); *Arizona v. Godfrey,* 136 Ariz. 471, 666 P.2d 1080, 1082 (App.1983); *Hollis v. Colorado,* 630 P.2d 68, 70 (Colo.1981); [13] *Stark v. Mississippi,* 133 Miss. 275, 97 So. 577 (1923); *New York v. Morales,* 168 A.D.2d 85, 87, 570 N.Y.S.2d 831, *cert. denied,* 78 N.Y.2d 970, 574 N.Y.S.2d 950, 580 N.E.2d 422 (1991); *Wisconsin v. Block,* 170 Wis.2d 676, 489 N.W.2d 715, 718 (App.1992). All but one of these cases were decided before *Fulminante,* and did not discuss the "structural error" concept that the Supreme Court introduced in *Fulminante.* [14]

### Failure To Swear Jury Is Presumptively Prejudicial

■ Based on our examination of the history and purpose of the jury oath, and the decisions of other jurisdictions, we

---

**12.** In *Mayfield* the defendant raised the issue eight years after the verdict and there was no factual support for the defendant's assertion that the jury was not sworn.

**13.** In *Hollis,* the defendant did not object, but the court rested its decision on harmless error. *See Hollis v. Colorado,* 630 P.2d 68, 70 (Colo.1981).

**14.** *Wisconsin v. Block,* the one case decided after *Fulminante,* did not discuss structural error. *See Wisconsin v. Block,* 170 Wis.2d 676, 489 N.W.2d 715, 718 (App.1992).

have no doubt that the jury oath is a fundamental part of the criminal jury trial, and that omission of the oath is presumptively prejudicial. Any impairment to the impartiality or integrity of the jury constitutes denial of one of a citizen's most cherished constitutional protections. *See Owens,* 399 Md. at 395–96, 924 A.2d 1072 ("There can be no question that the jury trial is a vital and cherished institution of United States and Maryland law"). The oath, for centuries, has been viewed as a solemn promise to undertake one of the most serious of legal, civic, and moral responsibilities. Without an oath, a defendant is denied full assurance of a fair and impartial jury.

The Court of Appeals' opinion in *Stokes v. State,* 379 Md. 618, 638, 843 A.2d 64 (2004), is illuminating in that it addresses the deprivation of a right with similarly intangible benefits, the right to have only regular jurors present during jury deliberations, without the extraneous influence of alternate jurors. The Court of Appeals ruled that "[t]he presence of alternate jurors who have no legal standing as jurors injects an improper outside influence on jury deliberations and impairs the integrity of the jury trial. Prejudice must be presumed where alternates breach the sanctity of the jury room." *Id.* The Court held the presence of alternates during deliberation to be a fundamental and presumptively prejudicial error, despite identical selection procedures for the regular and alternate jurors. *See id.* at 634–42, 843 A.2d 64.

An important reason assigned by the Court for presuming prejudice from the presence of the alternate jurors was **Maryland's longstanding refusal to "inquire into the deliberations and mental processes of the jurors."** *Id.* at 642, 843 A.2d 64 (emphasis added). The Court declined to assess the impact of the alternate jurors on the minds and deliberations of the regular jurors, an impact that, like the jury oath, would have required assessment of highly subjective factors.

The application of a presumptive prejudice test is consistent with our prior cases **where the type of error involved made it difficult to prove actual prejudice.** For example, this Court has held that a violation of Rule 4–361(b), dealing

with substitution of a judge during a jury trial, warrants a presumption of prejudice.... "[W]e believe the creation of a presumption of prejudice for a violation of this Rule recognizes the importance of compelling compliance with its requirements and recognizes as well the difficulty of proving actual prejudice...."

*Id.* at 638, 843 A.2d 64 (citation omitted and emphasis added).

The *Stokes* Court also relied on its earlier decision in *Hayes v. State*, 355 Md. 615, 735 A.2d 1109 (1999), holding that prejudice was presumed when an alternate juror was substituted for a regular juror after deliberations had begun:

The standard we adopted in *Hayes* we deemed to be a practical one, "because compliance with it can be established through objective and extrinsic evidence, without the need to question jurors as to what went on in the jury room after the door was closed-when deliberations really started."

*Stokes*, 379 Md. at 636–37, 843 A.2d 64 (citation omitted). The crux of the *Stokes* decision, that prejudice is presumed when an error potentially affects jury deliberations, but permits no objective measures to discern prejudice, applies here equally well.

We bear in mind that the formality of the courtroom, the presence of the judge, and the orderly process by which a jury is selected, as well as the potentially severe consequences of a verdict, *might* be sufficient to impress upon a juror the solemnity and significance of his or her duties. We simply cannot know, however, whether a juror might take these civic, legal and moral obligations *less seriously* if he or she were not asked to take an oath. Unlike the task of deciding, on an objective basis, whether there is so much legitimately admitted evidence of guilt that an erroneous admission of inadmissible evidence would not affect the verdict, an assessment of what the oath means to any one juror is much more subjective, and would require that we understand the mental processes of that juror, and his or her individual appreciation of the judicial process and sense of civic and moral responsibility.

We also view the failure to swear the jury as akin to violation of the public trial guarantee addressed in *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the effects of which are often intangible and difficult to prove. In *Waller*, the Supreme Court presumed that the closure of a suppression hearing was prejudicial, without further proof of prejudice, and vacated the conviction. *See id.,* 467 U.S. at 44–48, 104 S.Ct. at 2214–16. The Supreme Court reasoned, in part, that the public trial guarantee "embodies a view of human nature ... that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings[.]" *Id.,* 467 U.S. at 46 n. 4, 104 S.Ct. at 2215 n. 4 (quoting Harlan, J., concurring, in *Estes v. Texas*, 381 U.S. 532, 588, 85 S.Ct. 1628, 1662, 14 L.Ed.2d 543 (1965)).[15] By analogy, the historic faithfulness to using an oath in judicial proceedings embodies the view of human nature that people will act more responsibly if they have taken an oath to perform certain duties. *See* Samuel McCart, *Trial by Jury* 3 9–40 (1964) ("The larger part of the value of the juror's oath is that jurors individually and collectively take upon themselves a formal, moral obligation to the litigants and to each other, to honorably perform their duty to the best of their ability").

For reasons discussed, we conclude that the total failure to swear a jury is an error that requires a presumption of prejudice. This conclusion, however, does not compel us to decide that the *belated* swearing of a jury carries the same presumptive prejudice. We turn to that question now.

### Belated Swearing Of Jury Is Different

The jury was sworn before it retired to deliberate, so we can presume that it followed the duties and responsibility imposed by the oath while discussing the evidence and arriving at its verdict. Our next logical step is to ask whether the

---

15. *See also Carter v. State,* 356 Md. 207, 224–25, 738 A.2d 871 (1999) (closing of courtroom was structural error).

jury's mere listening to the evidence without being sworn is a presumptively prejudicial error.

Obviously, listening to the evidence is critical to the jury's decision. No juror can make a decision without having knowledge of the information that forms the basis for that decision. Yet, as is customary, the trial court carefully instructed the jury, *before* any evidence was presented, about its duties to listen to the evidence. The court said:

> Let me explain how this will work. When we get to the end, right, you'll be asked—you'll be told really by me that you have to decide this case based on the evidence in the case. Other material that you glean from what goes on around here that is not evidence you may not consider. Evidence is quite simply, comes to you in three ways. Most of it will be out of the mouth of witnesses on that witness stand. You may also receive certain documents, photographs, things. That you'll get to take up to the jury room once the case goes to you as a jury. [Except for stipulations between counsel and the court] [e]verything else you see or hear in here is not evidence. Arguments of Counsel, comments I may make upon the evidence, none of that is evidence To the extent that we talk about evidentiary evidence here at the bench where you can't hear, don't take it personally. It's our doing our job making sure you get the evidence you need in order to render a fair and impartial verdict.

> Please do not talk to parties in the courtroom during your comings and goings Please do not go out and investigate the crime on your own You have to base your decision on what you hear in this courtroom which is evidence. Arguments are not evidence. They're counsel's attempt to help you decide the evidence.

With these instructions, the jury gained an understanding of what evidence was, and that they must listen carefully to the evidence because that was the only basis for their decision. Thus, the jury was educated as to its role from the beginning.

When the error in failing to swear the jury was discovered, the court *voir dired* the jury, asking, is there "anything that would interfere with or anything that has occurred or would affect your ability to deliberate and decide this case in accordance with the oath you've just given, in accordance with the evidence in this case[?]" Based on their response, the court found that the jury "[had] been duly sworn, [and] that there has been no violation of the oath[.]"

Before taking the oath, the twelve persons selected to serve as jurors were not a fully qualified jury. Indeed, the failure to swear them could be considered a budding structural error. But it never developed into a full-blown structural error because, before the jury met to deliberate, it was sworn. This situation is analogous to when alternate jurors sit with the jury, and take breaks with the jury in the jury room. Yet, there is no error, structural or otherwise, until the deliberations begin, which is when the presence of alternate jurors impinges upon the defendant's right to a jury trial, so as to create a presumption of prejudice. *See Stokes*, 379 Md. at 638, 843 A.2d 64. Although ancient juries *provided the testimony themselves*, making the oath critical from the beginning, jurors in modern times listen to the evidence. Indeed, the usual oath focuses on the deliberations and verdict, with the juror promising to deliver the "true verdict ... according to the evidence."

We do not see structural error here. The jury was instructed, before hearing any evidence, that it must listen carefully to the evidence and that its verdict must be based solely on the evidence. It was then sworn before it began deliberations. To conclude that this was structural error would logically mean that we believe that taking the oath is a prerequisite to listening. We do not hold that view.

■ Accordingly, we will not presume prejudice, and a harmless error analysis is appropriate. Appellant has advanced no argument that he was actually prejudiced, relying, instead, on the presumption of prejudice. After doing our own harmless error analysis, moreover, we cannot discern any

prejudice suffered by Alston as a result of the late swearing. Indeed, in terms of teaching the twelve persons selected that they should listen carefully, and consider only the evidence, not extraneous information, the instructions given by the court at the commencement of the trial were more effective than the jury oath would have been.

We are not persuaded otherwise by Alston's argument that the court asked the jurors the wrong question when it conducted the *voir dire* right before the late swearing. Although, as Alston suggests, the court could have asked whether they "had been acting all along as if they were under oath[,]" the inquiry actually posed was sufficient to garner a response from any juror who believed that he or she had not listened to the evidence with a serious frame of mind and a sense of his or her moral obligation to the defendant.

 We are mindful that in Maryland and elsewhere, courts treat the swearing of the jury as the demarcation of when a trial commences for double jeopardy purposes, giving that moment in time a special significance. *See State v. Woodson,* 338 Md. 322, 329, 658 A.2d 272 (1995); *see also Downum v. United States,* 372 U.S. 734, 738, 83 S.Ct. 1033, 1036 n. 1, 10 L.Ed.2d 100 (1963). Alston relies on this as part of his argument that a belated swearing is structural error. We do not share his view. The basic premise of the double jeopardy prohibition is that when a criminal defendant has been put in jeopardy once, he or she may not be so placed again regarding the same offense. *See State v. Taylor,* 371 Md. 617, 630–31, 810 A.2d 964 (2002). A defendant can "be put in jeopardy even in a prosecution that did not culminate in a conviction or an acquittal[.]" *Crist v. Bretz,* 437 U.S. 28, 34, 98 S.Ct. 2156, 2160, 57 L.Ed.2d 24 (1978). This doctrine refers to "the species of double jeopardy law ... [known as] 'retrial following mistrial.'" *Fields v. State,* 96 Md.App. 722, 726, 626 A.2d 1037 (1993). As the Supreme Court explained in *Crist,*

> The basic reason for holding that a defendant is put in
> jeopardy even though the criminal proceeding against him

terminates before verdict was perhaps best stated in *Green v. United States* 355 U.S. 184, 187–188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957):

"The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

*Crist*, 437 U.S. at 35, 98 S.Ct. at 2160.

Although the Supreme Court in *Crist* pronounced the empaneling and swearing of a jury as the trigger point for attachment of the first jeopardy, the swearing itself is not the lynchpin of the Supreme Court's decision. The Court's decision was based upon the defendant's right to retain the jury that is first empaneled:

The reason for holding that jeopardy attaches when the jury is empaneled and sworn lies in the need to protect the interest of an accused in retaining a chosen jury. That interest [has been] described ... as a defendant's **"valued right to have his trial completed by a particular tribunal."** **It is an interest with roots deep in the historic development of trial by jury in the Anglo–American system of criminal justice. Throughout that history there ran a strong tradition that once banded together a jury should not be discharged until it had completed its solemn task of announcing a verdict.**

*Id.*, 437 U.S. at 35–36, 98 S.Ct. at 2161 (quoting *Wade v. Hunter*, 336 U.S. 684, 688, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949)) (emphasis added; footnote omitted).

Indeed, as Judge Moylan of this Court observed in *Fields*, 96 Md.App. at 728, 626 A.2d 1037, "[i]n English common law, it was always the case that initial jeopardy was not deemed to attach until a verdict was rendered. That is still the position

of the common law, both in England and in Maryland." In *Fields,* Judge Moylan characterized the Supreme Court's decision in *Crist* as a "tectonic shift" in the "undergirding analysis" of mistrial/retrial law that re-shaped history:

> In order to accommodate the mistrial/retrial rule into the body of preexisting double jeopardy law, it became logically compelling to **disengage the attachment of jeopardy from the rendering of a verdict and to move it back in time to the beginning of the trial.** In the service of that accommodation, it is now the federal law that in a jury trial the magic moment when jeopardy begins is the very instant that the jury is sworn. To make something seem to be jeopardy-dependent that had never historically been jeopardy-dependent, it was necessary to relocate the attachment of jeopardy. What occurred was an almost Orwellian revisionism. Under the new dispensation, everyone conveniently forgot two hundred years of history.

*Id.* at 729, 626 A.2d 1037 (citation omitted). We deduce from *Crist* and *Fields* that our decision that the swearing of a jury *after* evidence has been presented but *before* deliberations, does not conflict with double jeopardy law because the swearing itself is not pivotal to the double jeopardy analysis.

For the reasons discussed, we hold that the belated swearing of the jury was harmless error.

## II.

### In–Court Identification

■ Alston contends that the trial court erred when it permitted Kevin Morgan to make an in-court identification after the suppression court granted Alston's motion to suppress Morgan's pre-trial photo identification. The State, Alston argues, failed to meet its burden of showing the reliability of Morgan's in-court identification by clear and convincing evidence. Alston also argues that the trial court did not properly evaluate the reliability of Morgan's in-court identification by weighing the corrupting effect of the suggestive identification with factors favoring reliability, as set forth in

*Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

The trial court permitted Morgan's in-court identification of Alston after watching a tape of Morgan's suppression hearing testimony and hearing, directly, from Morgan as to the basis for Morgan's identification. The court allowed Morgan's in-court identification because it 1) viewed Morgan as having an adequate opportunity to observe Alston the day of the shooting, 2) viewed the taint from the photo identification as slight,[16] and 3) was not persuaded that Morgan's in-court identification was based on his encounter in court with Alston. In the court's view, there was "no question [Morgan] was there . . . no question he saw the person and it could be subject to cross."

The right to due process of law protects the accused from the introduction of evidence tainted by " 'unreliable pretrial identifications obtained through unnecessarily suggestive procedures.' " *Webster v. State,* 299 Md. 581, 599–600, 474 A.2d 1305 (1984) (quoting *Moore v. Illinois,* 434 U.S. 220, 227, 98 S.Ct. 458, 464, 54 L.Ed.2d 424 (1977)). When a court finds a pre-trial viewing or confrontation illegal, " 'any and all

---

**16.** The suppression court viewed Detective Townsend's exchange with Morgan during a photo identification procedure as impermissibly suggestive. Townsend testified that the following exchange occurred while showing Morgan a second photo array, containing more recent photographs:

The Court: And what specifically did you say to him?
[Detective Townsend]: I advised Kevin Morgan that the photographs that he had viewed on the previous occasion were older. I believe it was 1994, 1994, and the photographs he viewed on this one were of newer photographs.
The Court: When you spoke to him—I'm sorry, I don't understand—did you say a photograph was newer of the person you think committed the crime, or did you say all the photographs are newer. What did you say specifically?
[Detective Townsend]: I can't recall that ma'am.
The Court: Well, try.
[Detective Townsend]: I don't know. Probably "a photograph."
The Court: And did you word, "the person I think committed the crime," the phrase?
[Detective Townsend]: Yes, something to that effect.

evidence of the pre-trial identification is *per se* inadmissible.' " *See Jones v. State,* 395 Md. 97, 111, 909 A.2d 650 (2006) (citation omitted). In cases that a pre-trial identification is shown to be derived from an illegal identification procedure, however, "the State may still secure the admissibility of a *courtroom identification* by the same identifying witness if it established by clear and convincing evidence that a courtroom identification had a source independent of the prior" illegal identification procedure. *Barrow v. State,* 59 Md.App. 169, 186, 474 A.2d 967 (1984) (emphasis in original); *see United States v. Wade,* 388 U.S. 218, 240, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967).

In determining whether the courtroom identification has an independent source, relevant factors include "whether the witness knew the defendant prior to the crime, the witness' opportunity to view the defendant at the time of the crime, the description or identification of the criminal made by the witness prior to the illegal confrontation or viewing, and the facts surrounding the identification at the illegal confrontation or viewing." *Barrow,* 59 Md.App. at 186, 474 A.2d 967 (citing *Wade,* 388 U.S. at 240–42, 87 S.Ct. at 1939–40). "The Supreme Court has made clear that reliability is the linchpin in determining the admissibility of identification testimony[.]" *Barrow,* 59 Md.App. at 185, 474 A.2d 967 (quoting *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253 (1977)).

Alston argues that the trial court failed to properly evaluate the reliability of Morgan's in-court identification because it did not apply the following *Manson* factors:

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Id.,* 432 U.S. at 114, 97 S.Ct. at 2253 (citation omitted). We disagree, and conclude that, to the extent they were applicable, the court fully considered these factors.

On the day of Cabizza's murder, Morgan, on two separate occasions, had an opportunity to view Alston during daylight hours. Morgan indicated that he first observed an individual, whom he later recognized as Alston, come up to him and ask him for heroin. Morgan then saw Alston emerge from an alley after he had been robbed by Cabizza. Later that afternoon, Morgan observed Alston again, from approximately ten feet away, when he saw Alston shoot Cabizza. From these occasions, Morgan had an adequate opportunity to view Alston the day of the shooting, enabling him to identify Alston in court, independent of the pre-trial photo identification.

The court considered these factors after it asked counsel for applicable cases on reliability, which were provided. The trial court focused on whether Morgan was present during the robbery that preceded the murder, and whether Morgan had seen Alston twice, or only once, on the day of the murder. After watching the videotape of the suppression hearing, it concluded that Alston "certainly had an opportunity to see the man, an adequate opportunity and he had indicated that he could recognize [Alston.]" These are appropriate reliability factors that are discussed in *Manson. See id.*

The trial court also properly considered the facts surrounding Morgan's identification made at the pre-trial photo array, and the "corrupting effect of the identification itself." *See id.* The court acknowledged defense counsel's point that "the police officer in the second photo array admitted that … the suspect was in the [pre-trial] photo array," but commented, "that's such a slight thing compared to what could have been done." The court concluded: "There's no question he had opportunity to see the guy and I'm not persuaded that the identification is driven by the encounter in Court with the man. He saw the man and the identification is worth whatever it's based an all surrounding facts."

Although the trial court did not discuss "the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, or the time between the crime and the confrontation," Alston does not contend that any of these factors detracted from the reliability of the in court identification. We conclude the court committed no error in admitting Morgan's testimony.

## III.

### Life Sentence For Conspiracy To Murder

Alston maintains that the trial court erred as a matter of law when sentencing him to life in prison, in interpreting the jury's verdict as a conviction for conspiracy to murder in the first degree. Because the court instructed on both first and second degree murder, and the jury convicted Alston of "conspiracy to murder," without specifying the degree, Alston argues that he could only have been found guilty of conspiracy to commit second degree murder. Alston asserts that the court's life sentence for first degree murder violated his due process right to have every fact material to his guilt decided by the jury.

At the close of Alston's trial, the court instructed the jury on Alston's conspiracy and murder charges in the following manner:

The Defendant is charged with the crime of conspiracy to commit murder. Conspiracy is an agreement between two or more person [sic] to commit a crime. In order to convict the Defendant of conspiracy, the State must prove ... that the Defendant entered into an agreement with at least one other person to commit the crime of murder and that the Defendant entered into the agreement with the intent that that crime be committed.

Now, as to murder/homicide. It's two degrees of homicide applicable to this case. First degree premeditated murder, second degree murder. First degree murder is the intentional killing of another person with willfulness, deliberation and premeditation. In order to convict the Defendant of

first degree murder, the State must prove that the conduct of the Defendant caused the death of victim and that the killing was willful, deliberate and premeditated.

"Willful" means that the Defendant actually intended to kill the victim. "Deliberate" means that the Defendant was conscious of the intent to kill. "Premeditated" means that the Defendant thought about the killing and that there was enough time before the killing, though it may only have been brief, for the Defendant to consider the decision whether or not to kill and enough time to weigh the reasons for and against the choice. The premeditated intent to kill must be formed before the killing.

Now, second degree murder. Second degree murder is the killing of another person with either the intent to kill or the intent to inflict such serious bodily harm that death would be the likely result. Second degree murder does not require premeditation or deliberation. In order to convict the Defendant of second degree murder, the State must prove that the conduct of the Defendant caused the death of the victim and that the Defendant engaged in the deadly conduct either with the intent to kill or the intent to inflict such serious bodily harm that death would be the likely result.

The jury found Alston guilty of conspiracy to murder, but not guilty of first and second degree murder. The trial court sentenced Alston to life in prison because "the facts of the case establish that whatever else this was, it was a cold-blooded act." Alston moved for a new trial on the ground that the conspiracy to murder instruction was not specific as to whether the conspiracy was to commit first or second degree murder. The court denied Alston's motion, reasoning that conspiracy to murder, by definition, must be conspiracy to commit first degree murder. The court reasoned that conspiracy requires one to "plan, think, devise, and so forth." The court then concluded that "no reasonable jury could have found conspiracy to commit second degree murder on these facts."

 Alston's due process challenge concerning his life sentence is based on *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The Due Process Clause entitles criminal defendants to " 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " *Id.,* 530 U.S. at 476–77, 120 S.Ct. at 2355–56 (citation omitted). In *Apprendi,* the Court held that due process requires that a jury determine any fact, other than the fact of a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum. *See id.,* 530 U.S. at 490, 120 S.Ct. at 2362–63. Relying on *Apprendi,* Alston maintains that due process required a jury to determine every element of the crime of conspiracy to commit first degree murder in order for a judge to impose a life sentence. Alston argues that, because the jury could have been rendering a verdict for conspiracy to commit second degree murder, the circuit court violated the mandate of *Apprendi* when it sentenced him to life in prison, a sentence exceeding the statutory maximum for conspiracy to commit second degree murder. *See* Md.Code (2002, 2006 Supp.), § 2–204(b) of the Criminal Law Article (CL) (imprisonment for second degree murder shall not exceed thirty years); CL § 1–202 (punishment for conspiracy may not exceed the maximum punishment for the crime that the person conspired to commit).

*Apprendi* does not support Alston's contention because it dealt with an enhanced sentencing law. *See id.,* 530 U.S. at 470, 120 S.Ct. at 2352. In *Apprendi,* the Supreme Court "held that a state hate crime statute, which authorized an increase in the maximum prison sentence based on a judge's finding [rather than the jury's] that the defendant acted with the purpose to intimidate because of race, violated the due process clause of the Fourteenth Amendment[.]" *Commonwealth v. Velazquez,* 61 Mass.App.Ct. 667, 814 N.E.2d 356, 360 n. 4 (2004).

In *Velazquez,* a Massachusetts court was presented with a challenge, similar to Alston's, that the court violated the defendant's *Apprendi* rights when the court erroneously in-

structed the jury on the offense of armed assault with intent to murder, the jury convicted the defendant of the offense based on the erroneous instruction, and the court imposed a sentence based upon the jury's verdict.[17] *See Velazquez,* 814 N.E.2d at 359–60. The *Velazquez* court held *Apprendi* to be inapplicable, "because the statute under which the defendant was convicted . . . does not provide for an enhanced sentence beyond the statutory maximum[.]" *Id.* at 360 n. 4. As in *Velazquez, Apprendi* is not applicable here, because Alston was not given an enhanced sentence beyond that statutorily called for in the case of conspiracy to commit first degree murder. Although the principle that the jury must find all the facts necessary to satisfy the elements of the crime is similar to the principle underlying *Apprendi,* we do not see this as an *Apprendi* case.

Rather, Alston bases his claim that a life sentence is illegal on the grounds that the jury instructions may have misled the jury to the conclusion that it could convict him for conspiracy to murder, without finding that he possessed the requisite intent that the victim die. *See Mitchell v. State,* 363 Md. 130, 148, 767 A.2d 844 (2001)(The jury must determine the presence of the elements of first degree murder, that the members of the conspiracy intended to commit a deliberate and premeditated killing. Deliberation requires a "full and conscious knowledge of the purpose to kill[.]").

The State responds to Alston's challenge to his life sentence based on the *Mitchell* Court's holding that conspiracy to commit second degree murder in the form of killing another person with intent to kill, but without deliberation and pre-meditation, is not a crime in Maryland. *See Mitchell,* 363 Md. at 150, 767 A.2d 844 ("Conspiracy to commit this form of second degree murder is not a crime in Maryland."). It

---

**17.** The defendant in *Velazquez* argued that because of the improper instruction, omitting the element of malice, the jury could only convict him of the lesser included offense of assault with intent to kill. *See Commonwealth v. Velazquez,* 61 Mass.App.Ct. 667, 814 N.E.2d 356, 360–61 (2004).

contends that *Mitchell,* 363 Md. at 149, 767 A.2d 844, establishes that Maryland only recognizes conspiracy to commit murder in the first degree, and that "the sentencing court properly imposed the lowest statutory penalty for conspiracy to commit murder in Maryland, life imprisonment."

In *Mitchell,* the Court held that a conspiracy "to kill another person unlawfully and with malice aforethought ... is necessarily one to commit murder in the first degree ... as the agreement itself, for purposes of the conspiracy, would supply the necessary deliberation and premeditation." *Mitchell,* 363 Md. at 149, 767 A.2d 844. "[T]he kind of awareness and reflection necessary to achieve the unity of purpose and design for a conspiracy is essentially the same as that required for deliberation and premeditation." *Id.*

Alston maintains, however, that the *Mitchell* Court did not reach the issue of whether one could be convicted of conspiracy to commit one of the other alternative forms of second degree murder. He is correct that the Court expressly refrained from ruling on that issue. The Court first delineated the alternate types of second degree murder:

[S]econd degree murder embraced a killing accompanied by any of at least three alternative states of mind (*mentes reae* ):

[1] killing another person (other than by poison or lying in wait) with the intent to kill, but without the deliberation and premeditation required for first degree murder; [2] killing another person with the intent to inflict such serious bodily harm that death would be the likely result; and [3] what has become known as depraved heart murder-a killing resulting from "the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not."

*Id.* at 147, 767 A.2d 844 (citations omitted). After pointing out that "[t]here was no allegation that the conspiracy was merely to inflict such grievous bodily injury that death would be the likely result, [or] to commit a dangerous act with wanton

disregard of whether death would be the likely result," the Court concluded, *Id.* at 148, 767 A.2d 844:

We need not determine, therefore, whether a conspiracy to commit [either] of those forms of second degree murder constitutes a crime, but deal here only with whether it is unlawful to conspire to commit the first form of second degree murder.

Alston argues that he fits within the narrow crack in the door left open by *Mitchell,* and that the jury may have convicted him of conspiracy to commit second degree murder, which does not carry a life sentence. We agree that Alston's offense presents the issue that the *Mitchell* Court explicitly declined to decide, but we cannot ignore the Court's earlier decision in *State v. Earp,* 319 Md. 156, 571 A.2d 1227 (1990) which forecloses Alston's argument.[18]

In *Earp,* the Court encountered the question of whether a trial judge's finding that a defendant had an intent to inflict grievous bodily harm, but not an intent to murder, would be sufficient to support a finding of attempted murder in the second degree. *See id.* at 161, 571 A.2d 1227. The Court held that "where an attempted murder is charged, the State must show a specific intent to kill—an intent to commit grievous bodily harm will not suffice." *Id.* at 164, 571 A.2d 1227. The Court observed that "the crime of attempt consists of a specific intent to commit a particular offense coupled with some overt act in furtherance of the intent that goes beyond mere preparation." *Id.* at 162–63, 571 A.2d 1227. The Court then ruled that "the required specific intent in the crime of attempted murder is a specific intent to murder." *Id.* at 163, 571 A.2d 1227.

 Just as the crime of attempted murder requires proof that the defendant had the specific intent to murder, the crime of conspiracy to murder also requires proof that the defendant

---

**18.** Although it is possible that the *Mitchell* Court's express limitation on its holding foreshadowed its intention to re-visit the rule of *Earp,* we cannot assume that *Earp* is no longer good law.

had the specific intent to kill. As the *Mitchell* Court observed:

> When the object of the conspiracy is the commission of another crime, as in conspiracy to commit murder, the specific intent required for the conspiracy is not only the intent required for the agreement, but also, pursuant to that agreement, the intent to assist in some way in causing that crime to be committed.... Thus, if the conspiracy is to commit murder, *the intent must be to commit (or have someone commit) those acts that would constitute murder.*

*Mitchell,* 363 Md. at 146, 767 A.2d 844 (emphasis added).

To be sure, it is conceivable the jury may have been improperly led to believe from the instruction that it could convict Alston of conspiracy to commit second degree murder without finding a specific intent to kill. A proper instruction would have informed the jury that it could only convict Alston for conspiracy to commit first degree murder or that the specific intent to kill was required. But Alston failed to timely object to the instruction, as Md. Rule 4–325(e) requires:

> No party may assign as error the giving or the failure to give an instruction unless the party on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection.

Alston's failure to challenge the jury instruction in accord with Md. Rule 4–325(e) now bars his asserted assignment of error.[19] *See Hunt v. State,* 345 Md. 122, 150, 691 A.2d 1255 (1997)("[W]e have consistently held that the failure to challenge a jury instruction in accord with Md. Rule 4–325(e) will act as a bar to any subsequent assignment of error thereto.").

## IV.

### Sufficiency Of The Evidence

▮ Alston argues that the evidence was insufficient to sustain a conviction of conspiracy to murder, when the only

---

**19.** Alston did not object to the conspiracy to murder instruction until his post-trial motion for a new trial.

pertinent evidence was direct evidence from an alleged coconspirator that there was an agreement to commit robbery.

When reviewing a sufficiency claim, our Court views "the evidence, and all inferences fairly deducible from the evidence, in a light most favorable to the State." *Hackley v. State,* 389 Md. 387, 389, 885 A.2d 816 (2005). Therefore, the test on review is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See State v. Suddith,* 379 Md. 425, 429, 842 A.2d 716 (2004). When testifying about the conspiracy plan, Easton said that Alston asked "did he want me [sic] to get my stuff back," and Alston replied "Hey boy, you want your stuff back, and I said, yes, you know, I would like to have my stuff back, you know."

Alston argues that while this testimony may have established a conspiracy to rob, it did not suggest there was an agreement to kill anyone. Thus, he contends that it was reversible error for the court to deny his motion for acquittal on the grounds of insufficiency of the evidence. In denying this motion, the court said:

> Well, people I presume do intend the reasonable and probably [sic] consequences of their acts and everything doesn't have to be overt and expressed and I think it's fairly obviously [sic] as we discussed yesterday that on these facts, the State's witness would be as chargeable with this as anyone else and there was evidence in which the jury could conclude there was a conspiracy.

The Court of Appeals has set forth the elements of conspiracy in Maryland:

> A criminal conspiracy consists of the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement. The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design.

*Mitchell v. State*, 363 Md. 130, 145, 767 A.2d 844 (2001) (citation omitted). Conspiracy may be proven through circumstantial evidence, from which an inference of a common design may be shown. *See Gardner v. State*, 286 Md. 520, 524, 408 A.2d 1317 (1979).

In addition to the above testimony, Easton also stated that Alston asked him for his gun, and that the three men then drove to the place where Easton was robbed at gunpoint earlier in the day. Moreover, the evidence showed that after the men retrieved the gun, they returned to the scene of the initial robbery, and left Easton in the car to drive quickly from the scene. The testimony detailing this sequence of events could have allowed a rational jury to infer a common design to commit murder. After hearing Easton's testimony, the jury could have rationally determined beyond a reasonable doubt that Alston and Easton developed an unspoken agreement to commit murder.

The evidence here was sufficient to sustain the jury's verdict.

### Conclusion

We conclude that the belated swearing of the jury, under the circumstances of the case, was not structural or jurisdictional error, for which prejudice is assumed. Thus, the harmless error standard was properly applied. Moreover, the trial court did not err in admitting testimony identifying Alston as a participant in the crime. Neither did the court err in sentencing Alston to life in prison for conspiracy to murder.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**